JULIE HANCOCK & others[1] *vs.* COMMISSIONER OF EDUCATION
& others.[2]

Suffolk. October 4, 2004. - February 15, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Commonwealth,* Education, Financial matters. *Education,* Role of courts. *Constitutional Law,* Education.

This court declined to adopt the conclusion of a specially assigned judge of the Superior Court that the Commonwealth, despite this court's holding in *McDuffy* v. *Secretary of the Executive Office of Education,* 415 Mass. 545 (1993), presently is not meeting its obligations, as set forth in Part II, c. 5, § 2, of the Massachusetts Constitution, to provide education in certain public school districts for the children there enrolled, and this court therefore rejected the Superior Court judge's recommendations for further judicial action at this time. [430]

MARSHALL, C.J., with whom SPINA and CORDY, JJ., joined, was of the view that where the Governor and the Legislature, subsequent to this court's holding in *McDuffy* v. *Secretary of the Executive Office of Education,* 415 Mass. 545 (1993), had established, had exercised ultimate control over, and had provided substantial resources to support public education in a way that minimized rather than accentuated differences between communities based on property valuations, constitutionally impermissible classifications, and other criteria extrinsic to the educational mission, the court could not conclude that the Commonwealth presently is violating its constitutional duty to educate. [430-462]

COWIN, J., with whom SOSMAN, J., joined, concurred in the result, and expressed her views that the education clause of the Massachusetts Constitution, Part II, c. 5, § 2, imposed no duty beyond the establishment of some public schools by the Commonwealth — which had more than fulfilled its obligation — and conferred no role on the judiciary in educational policymaking. [462-473]

GREANEY, J., with whom IRELAND, J., joined, dissented, stating that the education clause of the Massachusetts Constitution, Part II, c. 5, § 2, as interpreted by *McDuffy* v. *Secretary of the Executive Office of Education,* 415 Mass. 545 (1993), requires that public schools equip their students with certain capabilities as the minimum standard by which to measure an educated child; agreeing with the Superior Court judge's conclusions that this constitutional imperative is not being satisfied in the school districts at

[1]Public school students in certain cities and towns of the Commonwealth, including Brockton, Springfield, and Winchendon.

[2]The chair, vice-chair, and nonstudent members of the board of education.

issue; and endorsing certain aspects of the judge's recommendations for further judicial action. [473-485]

IRELAND, J., with whom GREANEY, J., joined, dissented, stating that, in determining whether the Commonwealth has met its constitutional obligation to provide education in the public schools for all children, this court must analyze whether the children are being educated in the seven academic capabilities described in *McDuffy* v. *Secretary of the Executive Office of Education*, 415 Mass. 545 (1993): based on that standard, he would adopt the Superior Court judge's finding that the Commonwealth is violating its constitutional duty to educate and would require the defendants, within six months, to conduct certain cost studies. [485-493]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on March 27, 1990, and a motion for further relief was filed in the county court on December 22, 1999.

The case was reported by *Greaney*, J.

*Deirdre Roney*, Assistant Attorney General (*Juliana deHaan Rice & Jane L. Willoughby*, Assistant Attorneys General, with her) for the defendants.

*Michael D. Weisman* (*Rebecca P. McIntyre, Emiliano Mazlen, Peter E. Montgomery, & Alan Jay Rom* with him) for the plaintiffs.

The following submitted briefs for amici curiae:

*Harvey J. Wolkoff* for State Senator Jarrett T. Barrios & others.

*Mark R. Freitas* for Massachusetts Alliance for Arts Education & others.

*Richard W. Benka* for Massachusetts Health Council, Inc., & others.

*Joel Z. Eigerman* for Jewish Alliance for Law and Social Action & others.

*Daniel J. Gleason* for Jonathan Kozol.

*Roger L. Rice & Jane E. Lopez* for Centro Latino de Chelsea & others.

*M. Julie Patiño, Nadine Cohen, & Laura Maslow-Armand* for Lawyers' Committee for Civil Rights Under Law of the Boston Bar Association & others.

*Andrea C. Kramer, A. Lauren Carpenter, & Robert E. Sullivan* for Massachusetts 2020 Foundation & others.

*Ann Clarke, Stephen J. Finnegan, Jeffrey N. Jacobsen, & Michael J. Long* for Massachusetts Teachers Association/NEA & others.

*Thomas J. Dougherty & Kurt Wm. Hemr* for Massachusetts Urban School Superintendents.

*Henry C. Dinger & Benjamin M. Wattenmaker* for Massachusetts Business Alliance for Education & others.

*M. Robert Dushman, Albert W. Wallis, & Samantha L. Gerlovin* for MassPartners for Public Schools & another.

*Daniel J. Losen* for The Civil Rights Project at Harvard University.

*Michael D. Vhay* for Federation for Children with Special Needs, Inc.

*Neil V. McKittrick & Patrick M. Curran, Jr.,* for Strategies for Children, Inc., & another.

BY THE COURT. This matter is before the court on reservation and report by a single justice. A full description of the procedural background of the matter is set forth in the concurring opinion of the Chief Justice.

A majority of the Justices decline to adopt the conclusion of the specially assigned judge of the Superior Court that the Commonwealth presently is not meeting its obligations under Part II, c. 5, § 2, of the Massachusetts Constitution, and reject her recommendation for further judicial action at this time. The plaintiffs' motion for further relief is therefore denied, and the single justice's ongoing jurisdiction shall be terminated. By this action, the court disposes of the case in its entirety.

*So ordered.*

MARSHALL, C.J. (concurring, with whom Spina and Cordy, JJ., join). For its effective functioning, democracy requires an educated citizenry. In Massachusetts the democratic imperative to educate finds strong voice in the "education clause" of the Massachusetts Constitution, Part II, c. 5, § 2 (education clause),[1]

---

[1]Part II, c. 5, § 2, of the Massachusetts Constitution provides, in pertinent part: "Wisdom and knowledge, as well as virtue, diffused generally among

which "impose[s] an enforceable duty on the magistrates and Legislatures of this Commonwealth to provide education in the public schools for the children there enrolled, whether they be rich or poor and without regard to the fiscal capacity of the community or district in which such children live." *McDuffy* v. *Secretary of the Executive Office of Educ.*, 415 Mass. 545, 621 (1993) (*McDuffy*). This reflects the conviction of the people of Massachusetts that, because education is "fundamentally related to the very existence of government," *id.* at 565, the Commonwealth has a constitutional duty to prepare all of its children "to participate as free citizens of a free State to meet the needs and interests of a republican government, namely the Commonwealth of Massachusetts." *Id.* at 606. Today, I reaffirm that constitutional imperative. The question is whether the Commonwealth presently is meeting its duty to educate.

Twelve years ago, in *McDuffy*, this court declared that the Commonwealth failed to fulfil that obligation, *id.* at 617, where the Commonwealth had delegated the responsibility for public school education to local communities, and its system of funding primary and secondary public education relied all but exclusively on local property taxes. That system left property-poor communities with insufficient resources to provide students with educational opportunities comparable to those available in property-rich communities. It amounted to an abdication of the Commonwealth's duty to educate. See *id.* at 614-617. This court left correction of the constitutional violation to the elected branches of government and left to the discretion of a single justice whether to retain jurisdiction of the case. *Id.* at 550-551, 621.

the body of the people, being necessary for the preservation of their rights and liberties; and as these depend on spreading the opportunities and advantages of education in the various parts of the country, and among the different orders of the people, it shall be the duty of legislatures and magistrates, in all future periods of this Commonwealth, to cherish the interests of literature and the sciences, and all seminaries of them; especially the university at Cambridge, public schools and grammar schools in the towns; to encourage private societies and public institutions, rewards and immunities, for the promotion of agriculture, arts, sciences, commerce, trades, manufactures, and a natural history of this country; to countenance and inculcate the principles of humanity and general benevolence, public and private charity, industry and frugality, honesty and punctuality in their dealings; sincerity, good humour, and all social affections, and generous sentiments among the people."

Three days after *McDuffy* issued, the omnibus Education Reform Act of 1993 (act), long under consideration in the Legislature, became law. See St. 1993, c. 71, enacted by emergency preamble on June 18, 1993. See generally G. L. cc. 69-71. There, the Legislature declared its "paramount goal" to provide a public education system that reflected "a consistent commitment of resources sufficient to provide a high quality public education to every child," and that would extend to all children "the opportunity to reach their full potential and to lead lives as participants in the political and social life of the [C]ommonwealth and as contributors to its economy." G. L. c. 69, § 1. The act, as I shall describe below, radically restructured the funding of public education across the Commonwealth based on uniform criteria of need, and dramatically increased the Commonwealth's mandatory financial assistance to public schools. The act also established, for the first time in Massachusetts, uniform, objective performance and accountability measures for every public school student, teacher, administrator, school, and district in Massachusetts.

The plaintiffs here, all students in Commonwealth public schools, claim that evidence from the public school districts of Brockton, Lowell, Springfield, and Winchendon (which the parties have termed the "focus districts") demonstrates that public education in those districts has not improved significantly since 1993, and that the Commonwealth is still in violation of its constitutional obligation to educate children in its poorer communities, most notably children with special educational needs. A Superior Court judge specifically assigned to hear evidence and report to the single justice agreed. She found that, while substantial improvements in public education had occurred since 1993, significant failings persisted in the focus districts, and that the Department of Education (department) lacked sufficient resources and capacity to address these failings. She recommended that the department be ordered to determine the "actual cost" of funding a "constitutionally adequate level of education" for all students in the focus districts, and that the Commonwealth be ordered to implement the funding and administrative changes necessary to achieve that result. The single justice reserved and reported the case to the full court.

I accord great deference to the Superior Court judge's thoughtful and detailed findings of fact. I accept those findings, and share the judge's concern that sharp disparities in the educational opportunities, and the performance, of some Massachusetts public school students persist. The public education system we review today, however, is not the public education system reviewed in *McDuffy*. Its shortcomings, while significant in the focus districts, do not constitute the egregious, Statewide abandonment of the constitutional duty identified in that case.[2]

In the twelve years since *McDuffy* was decided, the elected branches have acted to transform a dismal and fractured public school system into a unified system that has yielded, as the judge found, "impressive results in terms of improvement in overall student performance." She found that "spending gaps between districts based on property wealth have been reduced or even reversed. The correlation between a district's median family income and spending has also been reduced." Public dollars for public education are now being allocated to where they are the most effective: defining core educational goals for all students, evaluating student performance toward those goals, and holding schools and school districts accountable for achieving those goals. See G. L. c. 69, §§ 1, 1D. A system mired in failure has given way to one that, although far from perfect, shows a steady trajectory of progress.

No one, including the defendants, disputes that serious inadequacies in public education remain. But the Commonwealth is moving systemically to address those deficiencies and continues to make education reform a fiscal priority. It is significant, in my view, that the Commonwealth has allocated billions of dollars for education reform since the act's passage, and that this new and substantial financial commitment has continued even amidst one of the worst budget crises in decades. By creating and implementing standardized Statewide criteria of

---

[2]As I shall later describe, one of the key findings informing the court's ruling in *McDuffy* v. *Secretary of the Executive Office of Educ.*, 415 Mass. 545 (1993) (*McDuffy*), was evidence that, before the enactment of the Education Reform Act of 1993 (act), many of the Commonwealth's children, notably poor children, urban children, children of color, and children with special needs were in essence systematically discarded educationally, with no obligation recognized by the Commonwealth to intervene on their behalf.

funding and oversight; by establishing objective competency goals and the means to measure progress toward those goals[3]; by developing, and acting on, a plan to eliminate impediments to education based on property valuation, disability, lack of English proficiency, and racial or ethnic status; and by directing significant new resources to schools with the most dire needs, I cannot conclude that the Commonwealth currently is not meeting its constitutional charge to "cherish the interests of . . . public schools." Part II, c. 5, § 2.

I interject some words of caution. I do not retreat from the court's holding in *McDuffy*.[4] The education clause "impose[s] an enforceable duty on the magistrates and Legislatures of this Commonwealth to provide education in the public schools for the children there enrolled, whether they be rich or poor and without regard to the fiscal capacity of the community or district in which such children live." *Id.* at 621. It remains "the responsibility of the Commonwealth to take such steps as may

[3]The plaintiffs do not contend that the competency objectives and standards, which we describe in greater detail below, are constitutionally flawed, and for sound reasons. In enacting and implementing the Education Reform Act, Massachusetts is a leader in education reform among those States in which litigation concerning the respective provisions of the education clauses of State Constitutions has occurred.

[4]Two other Justices are in accord, although for different reasons, that under *McDuffy* the Commonwealth presently is meeting its constitutional obligation to educate. *Post* at 464-466. Whereas Justice Spina, Justice Cordy, and I would affirm *McDuffy*, they would overrule it in significant respects. Justices Cowin and Sosman posit that *McDuffy* impermissibly broadened the meaning of the education clause by imposing on the Commonwealth an enforceable obligation — that is, a duty subject to judicial review. See, e.g., *post* at 464 (while education clause "presumes the establishment of some public schools by the legislative and executive branches, nowhere in its text does the clause . . . confer any role on the judiciary to enforce it") *post* at 469 ("where the plaintiffs only claim widespread deficiencies in the public school system under the education clause, remedies must come from the legislative and executive branches"). In their view, once the legislative and executive branches establish and maintain "some" public schools, a court has no authority under the education clause to hear any matter concerning public education. We could not disagree more. The framers of the education clause saw public education as vital to the survival of personal freedom and a republican form of government. Had they intended the clause to be virtually unenforceable, they would not have cast the duty to educate as a mandatory legal obligation. See *McDuffy, supra* at 566-567 (discussing use of "duty" and "shall" in education clause).

be required in each instance effectively to devise a plan and sources of funds sufficient to meet the constitutional mandate." *Id.* I do not suggest that the goals of education reform adopted since *McDuffy* have been fully achieved. Clearly they have not. Nothing I say today would insulate the Commonwealth from a successful challenge under the education clause in different circumstances. The framers recognized that "the content of the duty to educate . . . will evolve together with our society," and that the education clause must be interpreted "in accordance with the demands of modern society or it will be in constant danger of becoming atrophied and, in fact, may even lose its meaning." *McDuffy, supra* at 620, quoting *Seattle Sch. Dist. No. 1* v. *State*, 90 Wash. 2d 476, 516 (1978).

Here, the legislative and executive branches have shown that they have embarked on a long-term, measurable, orderly, and comprehensive process of reform "to provide a high quality public education to every child." G. L. c. 69, § 1. They are proceeding purposefully to implement a plan to educate all public school children in the Commonwealth, and the judge did not find otherwise. They have committed resources to carry out their plan, have done so in fiscally troubled times, and show every indication that they will continue to increase such resources as the Commonwealth's finances improve. While the plaintiffs have amply shown that many children in the focus districts are not being well served by their school districts, they have not shown that the defendants are acting in an arbitrary, nonresponsive, or irrational way to meet the constitutional mandate.

I

In summarizing the relevant background, I shall not repeat the facts recounted in *McDuffy*, except as they are necessary to place the present controversy in its proper context. I summarize the relevant facts subsequent to the McDuffy decision in greater detail, drawing from the judge's findings and other undisputed material of record.

I begin with the situation confronting the Legislature and the court prior to the enactment of the Education Reform Act. At that time, public education in Massachusetts was governed by a

loosely connected melange of statutes, local regulations, and informal policies. See *McDuffy, supra* at 556. Locally elected school boards in hundreds of communities across the Commonwealth had broad, individual discretion to set educational policy and practice. *Id.* at 607-608. As a direct result of the executive and legislative branches' hands-off approach to public education, property-poor localities were left perennially unable to educate their students. *Id.* at 614. Although Commonwealth aid for local public school education was mandated, the statutory guidelines went largely unheeded, leaving cities and towns at the mercy of unpredictable annual appropriations from the Legislature. See *McDuffy, supra* at 613-614. Moreover, communities were not required to differentiate Commonwealth aid for public schools from other Commonwealth aid, or even to use school aid for the schools. *Id.* at 556. The statutory authority of the department and a board of education (board) to establish and enforce uniform educational standards existed more on paper than in practice. See *id.* at 614-615.

Beginning in 1978, public school students in property-poor cities and towns in Massachusetts filed suit in the county court against State education officials. A Superior Court action sought a declaration that the Commonwealth's school-financing scheme effectively denied them an opportunity to receive an adequate education in their communities, in contravention of the Massachusetts Constitution. See generally *McDuffy, supra* at 548-550 & n.4.[5] In 1992, the lawsuits, now consolidated, came to the court on reservation and report of the single justice on facts stipulated by the parties. *Id.* at 549.

As various education proposals made their way through the Legislature in the early 1990's, the Legislature was aware of the pending *McDuffy* case. The representative who chaired a special legislative committee to reform education expressed his hope that Massachusetts would become the first State to overhaul education financing before being ordered to do so by a court. See Education, State House News Service, Jan. 4, 1993. The Governor stated in early January, 1993, six months before the

---

[5]The plaintiffs in *McDuffy* also claimed that the Commonwealth's actions violated arts. 1 and 10 of the Declaration of Rights, claims we did not reach in that case. See *McDuffy, supra* at 548, 557 n.15.

*McDuffy* decision issued, that the court's decision in the case could make a new funding scheme mandatory. *Id.* Legislative efforts culminated in the Education Reform Act.[6]

The act entirely revamped the structure of funding public schools and strengthened the board's authority to establish Statewide education policies and standards, focusing on objective measures of student performance and on school and district assessment, evaluation, and accountability.[7] See G. L. c. 69, § 1B. I discuss briefly the act's sweeping reach.

The act eliminated the central problem of public school funding that we identified as unconstitutional in *McDuffy*. See *Doe v. Superintendent of Schs. of Worcester*, 421 Mass. 117, 129 (1995) ("The question before the court in *McDuffy* . . . was whether the Massachusetts school-financing system was constitutional, and the court held that it was not"). Specifically, the act eliminated the principal dependence on local tax revenues that consigned students in property-poor districts to schools that were chronically short of resources, and unable to rely on sufficient or predictable financial or other assistance from the Commonwealth. The act established for the first time a "[f]oundation budget" for each and every Massachusetts school district, derived from a complex formula designed to account for the number and needs of the children residing in each district. See G. L. c. 70, §§ 2 et seq.[8] The defendants have described the foundation budget as the State's estimate of the

---

[6]In enacting the act, the three branches of government did not, "in fact and law," act in "joint enterprise" to revamp the structure of public education in the Commonwealth. *Post* at 473. Such a proposition is extraordinary, see art. 30 of the Massachusetts Declaration of Rights (separation of powers), and contradicted by the record.

[7]The act was enacted with the following intent: "(1) that each public school classroom provides the conditions for all pupils to engage fully in learning as an inherently meaningful and enjoyable activity without threats to their sense of security or self-esteem, (2) a consistent commitment of resources sufficient to provide a high quality public education to every child, (3) a deliberate process for establishing and achieving specific educational goals for every child, and (4) an effective mechanism for monitoring progress toward those goals and for holding educators accountable for their achievement." G. L. c. 69, § 1.

[8]The foundation budget formula is adjusted for district enrollment and allocates for spending in many categories, including salaries and benefits for teachers and staff, building maintenance, books and materials, athletics, and

"*minimum* amount needed in each district to provide an adequate educational program" (emphasis added).[9]

The act guarantees that each public school district receive its foundation budget through a combination of Commonwealth and local funds. Where, before 1993, the Legislature ceded to municipalities virtually unlimited control over school budgets, the act now requires municipalities to provide a standardized contribution to education. A municipality's required contribution to its foundation budget depends in large part on its equalized property valuation. G. L. c. 70, § 6. The Commonwealth provides the difference between municipalities' mandatory funding obligations and their respective foundation budget amounts. G. L. c. 70, § 2. In practice, districts in wealthier communities with high property valuations receive most of their funding from local property tax receipts, while districts serving communities with less valuable property receive most of their funding from the Commonwealth. Localities have flexibility to allocate their foundation budget amounts according to local priorities, but they may not, as previously, use school funds to pay for other municipal services. They must spend them on public education. G. L. c. 70, § 8.

The act also established a centralized system of objective, data-driven, performance assessment and school and district accountability. As the court recently described at some length,

extracurricular activities. G. L. c. 70, §§ 2 et seq. The foundation budget formula also includes "factor[s]," or weights, to account for the costs of special education, English language learning, and low income students. These factors are converted into a per pupil amount. *Id.* As the Superior Court judge found, a "district's 'foundation enrollment' [is] measured in October of the year before the budget year. (For example, a school district's [fiscal year 2002] foundation budget is computed by using its student enrollment figures as of October 1, 2000.) The formula also includes an annual inflation adjustment, as well as a wage adjustment factor that seeks to compensate for different wage levels in different parts of the Commonwealth."

[9]The foundation budget system was premised on identifying the base level of funding necessary for each public school district in the Commonwealth "to provide an adequate educational program." Full funding of each district's foundation budget was scheduled to be phased in over seven years to permit communities to adjust to the new school finance structure. The Commonwealth met its target. As the judge found, it was only as of fiscal year 2000 that every operating school district in Massachusetts was spending at or above its foundation budget level.

see *Student No. 9* v. *Board of Educ.*, 440 Mass. 752, 755-759 (2004), the act imposes various obligations on the Commissioner of Education (commissioner) and the board to develop academic standards, and "curriculum frameworks" for attaining those standards (or "competency determination"), in certain "core subjects": mathematics, science and technology, history and social science, English language arts, foreign languages, and the arts. See G. L. c. 69, §§ 1B, 1D, 1E, 1I.[10] The act specifically requires, for the first time in the history of the Commonwealth, that every senior graduating from a school that accepts funds from the Commonwealth (including public, vocational, and charter schools) attain competency in the core subjects of mathematics, science and technology, history and social science, foreign languages, and English language arts, as measured by the student's score on the Massachusetts Comprehensive Assessment System examination (MCAS examination). See G. L. c. 69, § 1D; 603 Code Mass. Regs. § 30.03 (2000); *Student No. 9* v. *Board of Educ.*, *supra* at 758.[11] The requirement is not designed, however, to winnow underperforming students from the graduation process. Prior to the act, failing high school students would have been permitted either to graduate without basic skills or fade away from the public education system altogether. They are now given extensive remedial opportunities. See generally *id.* at 759-761. At present, the MCAS examination is administered in English and mathematics to students in grades four, eight, and ten. With some exceptions, students need a score in at least the "needs improvement" category in both subjects on the grade ten MCAS examination

[10]The curriculum frameworks "present broad pedagogical approaches and strategies for assisting students in the development of the skills, competencies and knowledge called for by these standards." G. L. c. 69, § 1E. Seven frameworks were developed and adopted from 1996 to 2003. The current versions date from August, 1999 (foreign languages), to August, 2003 (history and social science).

[11]As the court explained in *Student No. 9* v. *Board of Educ.*, 440 Mass. 752, 758 (2004), the MCAS examination "is a customized test, designed by a national testing company specifically for Massachusetts to be closely aligned with the curriculum frameworks." There are four "performance levels," or scores, for the MCAS examination: "A scaled score of 200-219 corresponds to 'failing,' a scaled score of 220-238 corresponds to 'needs improvement,' a scaled score of 240-258 corresponds to 'proficient,' and a scaled score of 260-280 corresponds to 'advanced.' " *Id.* at 758-759.

to receive a high school diploma. See generally *id.* at 758-760. The department's goal is that every public school student achieve a level of "proficient" or "advanced" on the MCAS examination of English and mathematics by 2014.[12]

The Commonwealth is now required to assist schools and districts that fail to improve student performance. See G. L. c. 69, § 1J. Under the act, schools and districts must demonstrate that they are making "adequate yearly progress" toward achieving, by 2014, student proficiency in English language arts and mathematics. Adequate yearly progress is assessed not only in the aggregate but also with respect to targeted subgroups: students receiving special education services; students with limited English proficiency; and minority students, including African-Americans, Hispanics, and Asians-Pacific Islanders. The purpose of the school performance ratings, as the judge found, "is to permit the department to assess underperformance and where there may be a need for State intervention, and also to look for districts that have experienced distinct improvements in student performance and that can help disseminate information about successful strategies; the latter are designated as 'compass schools.' " Schools with low performance ratings and schools that show either no progress toward improvement or worsening conditions are referred for "school panel review." Those schools are given the highest priority for district and Commonwealth support, which may include targeted additional funding or training by department specialists in areas such as curriculum development, instructional practices, and performance improvement planning. If the school panel review determines that a school is "underperforming," the department

---

[12]The Superior Court judge found that, "[o]riginally, the department was rating school and district performance according to a model that called for all students to achieve a level of Proficient on the English language arts and [mathematics] MCAS tests by 2020. The Federal NCLB law [No Child Left Behind Act of 2001, 107-110 (2002), 115 Stat. 1425, principally codified at 20 U.S.C. §§ 6301 et seq.], however, requires students in each school and district to achieve proficiency (as measured by the MCAS tests) by 2014, and also requires that each State have a single, unified system of accountability for both Federal and State purposes. Accordingly, the Massachusetts accountability system has been changed in some respects to comply with Federal requirements. One of these changes is that 2014 is now the target year for achieving proficiency in [English language arts] and math[ematics]."

schedules a fact-finding mission. Fact finding involves extensive, on-site evaluations by a team of specialists who report on ways a school might improve its performance. Underperforming schools must submit an improvement plan to the department. See G. L. c. 69, § 1J; 603 Code Mass. Regs. § 2.03(6) (2000). If the school does not improve sufficiently within twenty-four months, the department may deem it "chronically underperforming" and target it for additional corrective action. See G. L. c. 69, § 1J.

A similar evaluation process occurs at the district level. School district review is conducted by the office of educational quality and accountability, a separate agency within the department that began to operate in 2001. See G. L. c. 15, § 55A, as appearing in St. 2000, c. 384, § 4 (establishing office of educational quality and accountability). Chronically underperforming districts may be targeted for receivership. The judge stated that, "[a]ccording to the department, the school and district accountability system it has developed is one of the first in the United States." See generally *Student No. 9* v. *Board of Educ.*, *supra* at 755-759.

The Legislature also made institutional changes to reform the process of training and certification of public school teachers. The act abolished the long-standing practice of teacher tenure. It imposes stringent initial and renewal certification requirements for teachers that are "designed," in the words of the judge, "in part to link the educational requirements that new teachers must meet with the contents of the Massachusetts curriculum frameworks, and to enhance the quality and subject matter mastery of teachers. The [teacher] examination and these regulations are among the most rigorous teacher qualification programs in the United States."[13]

In summary, the act revolutionized public education in

---

[13]Prior to the act, the judge reported, "a teacher essentially could acquire life-time certification." Pursuant to the act, new teachers must now pass tests in writing, communication and literacy, and their subject matter. See G. L. c. 71, § 38G. Teachers must hold a bachelor's degree with a major concentration in the teacher's subject and participate in supervised practice teaching. See *id.*; 603 Code Mass. Regs. § 7.04(2)(b) (2001). Licenses are granted only provisionally until the teacher meets certain classroom teaching qualifications and participates in certain professional development activities, a process that

Massachusetts. Across the board, objective, data-driven assessments of student performance and specific performance goals now inform a standardized education policy and direct the Commonwealth's public education resources. The current, integrated public education system contrasts markedly with the system discussed in *McDuffy*. I turn now to the events that precipitated the current litigation.

In December, 1999, the plaintiffs revived the *McDuffy* case by filing a motion for further relief in the county court.[14] The plaintiffs alleged that the foundation budget in their districts "is insufficient to provide [them] with a constitutionally sufficient education." They further alleged that their school systems "continue to suffer with largely the same conditions" existing prior to June 1993, and that students were not receiving the public education mandated by *McDuffy*.[15]

On June 27, 2002, the single justice directed a specially assigned Justice of the Superior Court to "establish a tracking order, preside over discovery issues, hear the parties and their witnesses, and thereafter make findings of fact and such recommendations as the said specially assigned justice considers material to the within complaint." Following consultation with the parties, the judge proceeded to trial focusing the factual evidence on a group of districts fewer than the total. The plaintiffs ultimately selected four "focus" districts: Brockton, Lowell, Springfield, and Winchendon.[16] The plaintiffs also offered limited evidence from three other districts — Brookline, Concord-Carlisle, and Wellesley (comparison districts) — each

takes at least three years after the initial certification. See 603 Code Mass. Regs. § 7.04(2)(c) (2001). The full professional license is good for only five years, after which the teacher must apply for recertification on meeting certain professional development standards. See G. L. c. 71, § 38G; 603 Code Mass. Regs. § 44.03(1), (2), and (3) (2000).

[14]Subsequently, the single justice allowed the plaintiffs' motion to dismiss certain parties and substitute others.

[15]Specifically, the plaintiffs charged that they were not receiving an education conforming to seven "*McDuffy* capabilities," a phrase we discuss below.

[16]The judge found that three of the focus districts — Brockton, Springfield, and Lowell — were demographically similar. Each was an urban district with a racially and ethnically mixed student population, and also contained significant numbers of students of limited English proficiency and with special needs. In all three districts, median household incomes were among the lowest

of which had been presented as a comparison district in the *McDuffy* proceedings.[17]

Trial began on June 12, 2003, and concluded in January, 2004. The judge heard testimony from 114 witnesses and received in evidence more than 1,000 exhibits. On April 26, 2004, the judge issued a 318-page report containing thoughtful and comprehensive findings of fact, conclusions, and recommendations.

I shall discuss the judge's findings in detail below. Here I note only the judge's conclusion that, although the Commonwealth had accomplished substantial reforms in public education since 1993, it had failed to meet its constitutional obligation to equip all students in the focus districts, and especially those in the disadvantaged subgroups, with an education consistent with our holding in *McDuffy*. She recommended that the court provide remedial relief by directing the Commonwealth defendants (1) to ascertain the actual cost of providing all public school pupils in the focus districts with the educational opportunities described in *McDuffy*; (2) to determine the costs of providing "meaningful" educational improvement in the focus districts' capacity "to carry out an effective implementation of the necessary educational program"; and (3) to "implement whatever funding and administrative changes result from the determinations made in (1) and (2)."[18] Further,

in Massachusetts.

In Winchendon, median household incomes also are among the Commonwealth's lowest. However, in contrast to the focus districts of Springfield, Lowell, and Brockton, Winchendon is a small town with fewer than 2,000 public school students. Nearly ninety-five per cent of these students are white, and in 2002-2003, the district reported no students with limited English proficiency.

[17]The judge offered the defendants the opportunity to select one or more different school districts on which to present factual evidence for other comparison purposes, but they chose not to do so. Here, unlike in *McDuffy*, the defendants did *not* agree that the four districts were representative or typical of the other plaintiff districts.

[18]Although the judge's recommendations pertained specifically to the focus districts, she stated that, because she was "reasonably certain that the problems and challenges existing in the four focus districts repeat themselves in all or most of the school districts where the other plaintiffs reside . . . an order of remedial relief that concerns only the plaintiffs in the four focus districts would provide valuable guidance for the rest."

the judge recommended continued court oversight of the department's progress toward implementing the order.[19]

On May 20, 2004, the single justice reserved decision and reported the case to the full court, as noted above.

## II

## A

The question, as framed by the single justice, is "whether, within a reasonable time, appropriate legislative action has been taken to provide public school students with the education required under the Massachusetts Constitution." Put another way, the single justice asked whether, notwithstanding the considerable changes in public education that have occurred since 1993, the Commonwealth remains in violation of the education clause. I apply to the adjudicative task well-settled principles of review. I would accept the judge's findings of fact absent clear error, *Buster* v. *George W. Moore, Inc.*, 438 Mass. 635, 642-643 (2003). Her conclusions of law I assess de novo. *Wesson* v. *Leone Enters., Inc.*, 437 Mass. 708, 712-713 (2002). See *Commonwealth* v. *Murphy*, 362 Mass. 542, 551 (1972) (Hennessey, J., concurring). To effectuate the purpose of the education clause, I construe it as "a statement of general principles and not a specification of details." *McDuffy, supra* at 559, quoting *Cohen* v. *Attorney Gen.*, 359 Mass. 564, 571 (1970). I am mindful of the presumption of constitutional validity guiding our consideration, see *Fifty-One Hispanic Residents of Chelsea* v. *School Comm. of Chelsea*, 421 Mass. 598, 606 (1996) ("Constitutional analysis begins with a presumption of statutory validity"), and the substantial deference afforded to the department in carrying out the act's provisions. See *Student No. 9* v. *Board of Educ.*, 440 Mass. 752, 762 (2004) (administrative agency "has considerable leeway in interpreting a statute it is charged with enforcing"); *School Comm. of Wellesley* v. *Labor Relations Comm'n*, 376 Mass. 112, 116 (1978). I emphasize that this is not a case where the Legislature reason-

---

[19]On May 6, 2004, the defendants filed an emergency motion pursuant to Mass. R. Civ. P. 52 (b), as amended, 423 Mass. 1402 (1996), for additional findings and to amend findings. The judge denied the motion.

ably could be said to have neglected or avoided a constitutional command. Cf., e.g., *Perez* v. *Boston Hous. Auth.*, 379 Mass. 703, 740 (1980) (judicial intervention appropriate where public officials "persist[] in indifference to, or neglect or disobedience of court orders").

## B

I turn once more to the judge's findings, which comprise more than 300 pages. The judge's findings of fact are a model of precision, comprehensiveness, and meticulous attention to detail.[20] Although I shall set out only a general summary, I am confident that in their entirety the judge's findings will stand as a compelling, instructive account of the current state of public education in Massachusetts.

1. *Funding.* In the judge's words, the act "changed dramatically the manner in which public school elementary and secondary education is funded in Massachusetts." That change is evident both in dollars spent on public education and on substantially reduced disparities in education funding between rich and poor districts. In sheer dollars, the total amount annually spent on kindergarten to grade twelve education rose from approximately $3.6 billion in fiscal year (FY) 1993, prior to passage of the act, to $10.1 billion in FY 2002. Annual increases in school funding in that period averaged twelve per cent. State aid, the great bulk of it from foundation budget funding, accounted for about thirty-nine per cent of this annual spending.[21]

[20]The judge carefully examined the structure and operations of the Commonwealth's public education system in general, and for the focus districts she provided specific, often school-by-school, findings in numerous relevant areas. Her specific findings encompassed the following areas, among others, although not every category was relevant to every school or school district examined: demographic information, school funding, preschool funding and quality, elementary schools, junior high schools, high schools, English literacy programs, mathematics programs, remedial English and mathematics programs, history programs, science programs, arts programs, health physical education, foreign language programs, libraries, technology, special education, bilingual education, dropouts, teachers and teacher openings, professional development, school buildings, standardized test scores, and the percentage of high school graduates opting for postsecondary education.

[21]Local revenue (about fifty-five per cent) and Federal aid (about five per cent) make up the remainder of the amount of annual government spending on

In all, from 1993 to 2003, the Commonwealth contributed about $31 billion to fund public education.

The focus districts in particular have seen striking increases in their school spending in the years since the act became law. The judge found that, between 1993 and 2003, annual net school spending nearly doubled in Springfield (from $126.2 million to $236.4 million), and more than doubled in Brockton (from nearly $56 million to $143.5 million), Lowell (from $61 million to $136 million), and Winchendon (from approximately $5.78 million to almost $14 million).

The act also tackled the huge disparities in public school funding between rich and poor districts that we faulted in *McDuffy*. The judge found that "spending gaps between districts based on property wealth have been reduced or even reversed. The correlation between a district's median family income and spending has also been reduced."[22] In the ten-year period following passage of the act, the gap in per pupil spending between high-property-value districts and low-property-value districts was cut by one-half, from thirty-eight per cent in 1993 to approximately eighteen or nineteen per cent in 2003. And while "the top quartile of districts defined by median income is spending more per pupil than the lowest quartile, the difference between them has fallen from [twenty-seven per cent] to [seven per cent]" from 1993 to 2003.

The public education funding system, however, has not been immune from the effects of recent years of sharply diminished Commonwealth revenues. The judge reported decreases in Commonwealth aid to public schools since the "high water mark" of fiscal year 2002. Fiscal years 2003 and 2004 saw cuts in G. L. c. 70 aid, see note 21, *supra*, and "drastic" cuts in some public school grants programs. For example, "[e]arly literacy grants for early reading programs were . . . cut by two-thirds,"

public education in Massachusetts, with about eighty per cent of State funds coming from G. L. c. 70 accounts.

[22]In 2002, for example, public school funding per pupil in high poverty districts ($8,504) was four per cent higher than spending in low poverty districts ($8,144). This change is a marked reversal from the situation in 1993, when public school students in high poverty districts received about five per cent less public funding than public school students in low poverty districts ($5,317 and $5,607, respectively).

from $18.3 million in FY 2003 to $3.8 million FY 2004.[23] Overall, Commonwealth aid to public education declined about 5.5 per cent in FY 2003 and FY 2004. As the Commonwealth's fiscal situation improved in FY 2005, the Legislature acted to increase funding for public education, see, e.g., Letter from Governor Mitt Romney to the Senate and House of Representatives, June 25, 2004 (noting approval of $80 million to increase funding for special education), but prior decreases in funding forced the focus districts to lay off staff and scale back or cut some programs. The judge found that the department faced diminished resources just as its oversight responsibility was increasing significantly. In 2001, the judge found, the department identified between 100 and 200 schools as candidates for "underperforming" status because of "critically low" or "very low" MCAS examination scores. Due to a lack of resources within the department, however, only about twenty-four of those problem schools were accorded full school panel reviews. For the remaining schools, the task of mapping out improvements fell to the school districts themselves.

2. *Performance and accountability.* The judge reported the quality of public education in the four focus districts to be uneven at best. She also found substantial improvements in student performance and some outstanding examples of successful schools and programs in those same districts. We summarize her findings below.

The judge found that over-all academic performance of students in the focus districts, particularly those with special educational needs, was poor. Her conclusion is amply supported by evidence of MCAS examination scores in the focus districts. In 2003, for example, the Statewide average pass rate on the MCAS mathematics examination for grade ten was eighty-five per cent, but only seventy-three per cent in Brockton, sixty-seven per cent in Lowell, fifty-four per cent in Springfield, and seventy-seven per cent in Winchendon. In all four focus districts,

---

[23]Subsequent to the judge's report, the Commonwealth established in its FY 2005 budget as a new executive department, the Department of Early Education and Care. See G. L. c. 15D, inserted by St. 2005, c. 205, § 1 (effective July 1, 2005).

public school students who required special education, and students who had limited English proficiency, came from low-income families, or were members of racial or ethnic minority groups, performed at substantially lower levels on the MCAS examinations than did their peers in the focus districts. The pass rates for these targeted populations on the 2003 grade ten MCAS mathematics examination were twenty-three per cent in Brockton, twenty-five per cent in Lowell, fifteen per cent in Springfield, and twelve per cent in Winchendon, compared with a Statewide average of fifty per cent. Even these statistics overstate the academic achievements of students in the focus districts, because a disproportionately large number of those students pass the MCAS examinations with "needs improvement" scores. See note 11, *supra.* Pursuant to the provisions of the No Child Left Behind Act, by 2014 only students who attain the categories of "proficient" or "advanced" will be deemed to have passed the MCAS examination. See note 12, *supra.*

The judge found that the focus districts lagged in other measures of student achievement as well. Students in the focus districts, especially minorities, are less likely to take the Scholastic Achievement Test (SAT) for college entrance than their peers. And in each focus district, the dropout rate significantly exceeds the Commonwealth norm.[24]

The judge tied the focus districts' failings in student performance to a lack of educational resources. She amply documented schools in the focus districts that struggle with overcrowded classrooms, outmoded textbooks and libraries, inadequate technology, unsatisfactory services and educational access for special needs students, and decrepit or overcrowded school facilities. The judge found other problems as well, including antiquated curricula, teachers lacking proper teaching certification, and poor leadership and administration, a point we

---

[24]For example, Brockton had an adjusted dropout rate of 5.7 per cent in 2001. Brockton's adjusted dropout rate for 2001 was the lowest of the focus districts. For Lowell in that same period, the adjusted dropout rate was 9.8 per cent; for Springfield, eight per cent; and for Winchendon, six per cent. The "adjusted dropout rate" measure does not classify as a "dropout" any student who dropped out of school but returned by October 1 of the following year.

shall return to below.[25] Some of these same conditions characterized the public schools attended by the *McDuffy* plaintiffs. See
*McDuffy*, *supra* at 553-554 (listing stipulated conditions of
plaintiffs' schools). Not surprisingly, the judge found that, in
general, the current conditions in the focus districts compared
unfavorably to those of the comparison districts, and often to
Statewide average.

The judge determined that funding for the department was
inadequate to enable it to carry out its statutory duties of
evaluating and providing corrective measures to low-performing
schools and districts. She stated, among other things, that "in
the three years since the department developed the school accountability system, it has been able to conduct school panel
reviews in only twelve to fourteen schools each year, although
the annual pool of schools demonstrating 'low' or 'critically
low' performance is in the hundreds." The district review
process was similarly underfunded. Although the department's
goal is to review every school district every six years, the judge
was skeptical about this possibility, given the department funding levels then in effect. She concluded that "the department's
own lack of capacity impedes its ability effectively to help the
local districts with theirs."

The public education system in place since the 1993 act
mandates extensive Commonwealth involvement to improve
schools that are underperforming. Notwithstanding that the
department currently has difficulty meeting its statutory obligations in this regard, the judge found encouraging signs of
progress as a result of the Commonwealth's active stewardship
of public education, even amidst the depressing picture of
limitations and low performance in the focus districts. She
found that MCAS examination scores have been rising in the
focus districts since the first MCAS examinations were
administered in 1998. In 1998, for example, forty-four per cent
of Brockton's grade ten public school students failed the MCAS

---

[25]In almost every area she examined, the judge found Winchendon public
schools at the extreme end of fragility. While individual schools in Brockton,
Lowell, and Springfield were assessed as underperforming, the entire district
of Winchendon was one of only two districts to be rated underperforming by
the board in 2003, based on poor performance ratings from 1999 through
2002.

English language arts examination, a figure that was reduced by more than one-half (eighteen per cent) by 2003. MCAS grade ten English language arts examination scores showed similar improvements in Lowell (thirty-six per cent in 1998 and twenty-one per cent in 2003) and Springfield (sixty per cent in 1998 and thirty-four per cent in 2003), although they remained virtually steady at approximately twenty-one per cent in Winchendon. "Failing" scores on the MCAS grade ten mathematics examination from 1998 to 2003 dropped in Brockton, from seventy-six per cent to thirty-three per cent; in Lowell, from sixty-four per cent to thirty-six per cent; in Springfield,. from eighty-three per cent to fifty-three per cent; and in Winchendon from fifty-six per cent to thirty-four per cent.[26]

In addition to a general improvement over time in MCAS examination scores in the focus districts, the judge found other signs of progress precipitated by the Commonwealth's actions. I highlight some findings from each focus district. The department has designated four elementary schools in Springfield and Brockton as high-achieving "compass schools." In 2002, Brockton High School was one of six high schools designated a Commonwealth compass school in recognition of its significant gains in student achievement. "Overall, Brockton's sixth graders were one year and one month ahead of the national average on the Iowa Basic Skills test in language, six months ahead of the national average in math, and equal to the national average in reading."

Springfield has made considerable progress in developing programs for students struggling in mathematics, implementing successful teacher development programs, and running alternative school programs for students at risk of dropping out of school. Lowell offers full-day kindergarten to all children, has

---

[26]Comparative figures from 1998 were not available for the targeted subgroups, who fared far worse than their peers on the MCAS English language arts and mathematics examinations in every focus district. For example, the judge found that, in 2003, seventy-three per cent of Brockton's regular grade ten public school students passed the MCAS mathematics examination, compared with twenty-three per cent of special education students who did so. In the comparison district of Wellesley, the figures were ninety-nine per cent and eighty-two per cent, respectively; in Brookline, ninety-five per cent and seventy-nine per cent; and on Statewide average, eighty-five per cent and fifty per cent.

an extended day school program for middle-school children who need extra time to learn reading, writing, and mathematics, and has school libraries that "are in better shape than in other focus districts because Lowell has so many new and renovated schools." Even in Winchendon, one of only two "underperforming" districts in the Commonwealth, see note 25, *supra*, the judge found "a very good public school preschool program," which, however, lacked resources to accommodate all of the children who need to attend.

3. *Conclusion.* The evidence leaves no doubt that the act profoundly altered the Commonwealth's role in public education. The Commonwealth has devoted billions of dollars to the task of systemically reforming public education, and has cut funds for public education only when confronted by drastic revenue shortfalls. The evidence also establishes, as the dissenting opinions correctly point out, see *post* at 473-478 (Greaney, J., dissenting), *post* at 487-490 (Ireland, J., dissenting), that many schools in the focus districts are struggling to meet the goals of the act, but that the department is succeeding in raising the levels of student performance in the focus districts and Statewide, although much work remains. I now turn to the judge's conclusions.

## C

The judge concluded that the Commonwealth and the department "have accomplished much over the past ten years in terms of investing enormous amounts of new money in local educational programs, ensuring a far greater degree of equitable spending between rich and poor school districts, and redesigning in some fundamental ways the entire public school educational program." Notwithstanding these gains, she stated, "the factual record establishes that the schools attended by the plaintiff students are not currently implementing the Massachusetts curriculum frameworks for all students, and are not currently equipping all students with the *McDuffy* capabilities."

The judge reasoned that "a very important and independent cause" of poor student performance in the focus districts was that the foundation budget formula, on which all Massachusetts public schools depend, is structurally flawed because it fails to

account for the true costs of special education, aligning school districts with the curriculum frameworks, providing adequate teacher salaries (which comprise the "largest category of expenditure" in a school district's budget), and educating students who are bilingual or of limited English proficiency. Another cause of poor student performance, in her view, was that the department "does not presently have enough staff and resources to do the job it is expected and required to do." As a result, "the public school education programs provided to all the children who are enrolled [in the focus districts] do not meet the requirements of [the education clause]." I now examine the merits of the judge's legal conclusions and recommendations.

### III

In *McDuffy*, this court faced an overwhelming, stipulated body of evidence that the structure of public education in Massachusetts was condemning generations of public school students in our poorer communities to an inferior education. It was a record of abysmal failure. The public education system reviewed today has been radically overhauled with one "paramount goal" in mind — to implement a plan to educate *every* public school student in Massachusetts. See G. L. c. 69, § 1.

The judge and the parties all agree that the current system of public education has achieved a great deal in the twelve years since its enactment. The curriculum frameworks designed to educate students in core subjects "were uniformly described by witnesses for all parties to be of excellent quality, focusing on knowledge and skills that students need to acquire." They are "rigorous but reasonable," and "articulate a level of knowledge that students need if they are to achieve the *McDuffy* capabilities." The English language arts framework is of "exceptional quality," and the mathematics curriculum framework is "a world class document." The arts framework is "excellent," and the health curriculum framework was described by the plaintiffs' expert "to be one of the best if not the best in the nation." The teacher competency tests and the department's teacher licensing regulations "are among the most rigorous

teacher qualification programs in the United States." While the dissenting Justices claim that the department's efforts to improve educational standards have not reaped appreciable results, see *post* at 477-478 (Greaney, J., dissenting); *post* at 486-492 (Ireland, J., dissenting), the record proves otherwise. New schools are being built. The department is evaluating and addressing problems in underperforming schools and districts according to a plan of "pragmatic gradualism" that employs objective, measurable criteria to gauge progress. See *Student No. 9* v. *Board of Educ.*, 440 Mass. 752, 763-764 (2004) (board may phase in competency determinations required by act "in a reasonable manner and on a reasonable timetable"). In the focus districts, MCAS English language arts and math scores are improving. State spending on public education in the focus districts has more than doubled. Compass schools exist in districts that previously had none. Facilities, equipment, and supplies are being upgraded.

In assessing whether this record of considerable progress, marred by areas of real and in some instances profound failure, offends the education clause, I must consider that clause "in the light of the conditions under which it and its several parts were framed, the ends which it was designed to accomplish, the benefits which it was expected to confer, and the evils which it was hoped to remedy." *McDuffy, supra* at 559, quoting *Cohen* v. *Attorney Gen.*, 357 Mass. 564, 571 (1970). I must give its words "a construction adapted to carry into effect its purpose," *McDuffy, supra,* quoting *Cohen, supra,* while recognizing that, "[t]he content of the duty to educate which the Constitution places on the Commonwealth necessarily will evolve together with our society." *McDuffy,* at 620.

The constitutional imperative to "cherish the interests" of public school education requires the elected branches of government to assume actual, and not merely titular, control over public education. It is a structural command, dictating a specific organization of government. See *McDuffy, supra* at 565 (placement of education clause in Massachusetts Constitution "indicates structurally . . . that education is a 'duty' of government . . . . [T]he framers' decision to place the provisions concerning education in 'The Frame of Government' — rather than in the 'Declaration of Rights' — demonstrates that the

framers conceived of education as fundamentally related to the very existence of government").[27] The education clause mandates that the Governor and the Legislature have a plan to educate all public school children and provide the resources to establish and maintain that plan. See *McDuffy*, *supra* at 621. At the same time, the education clause leaves the details of education policymaking to the Governor and the Legislature. *Id.* at 610, 620.[28] Where the Governor and the Legislature establish, exercise ultimate control over, and provide substantial and increasing (subject only to dire fiscal circumstances) resources to support public education in a way that minimizes rather than accentuates differences between communities based on property valuations, constitutionally impermissible classifications, and other criteria extrinsic to the educational mission, see *id.* at 621, we cannot conclude that they are presently violating the education clause.

The plaintiffs read the education clause to mandate that all current public school students demonstrate competency in a specific program of education: that is, the seven "capabilities" that were identified in *McDuffy*. Those capabilities are:

> "(i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable students to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training

---

[27]See *Doe* v. *Superintendent of Schs. of Worcester*, 421 Mass. 117, 129 (1995) ("*McDuffy* should not be construed as holding that the Massachusetts Constitution guarantees each individual student the fundamental right to an education"); *Sherman* v. *Charlestown*, 8 Cush. 160, 163-164 (1851) (benefit of public education is common, not exclusive personal, right).

[28]This court recently held, for example, that the Commonwealth does not violate the education clause by electing to choose to implement educational goals over time. See *Student No. 9* v. *Board of Educ.*, 440 Mass. 752, 763 (2004).

or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient level of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market."

*Id.* at 618-619, quoting *Rose* v. *Council for Better Educ., Inc.*, 790 S.W.2d 186, 212 (Ky. 1989) *(Rose)*.[29] In *McDuffy*, this court recognized that an "educated child" possesses these "capabilities," *McDuffy, supra* at 618, but did not mandate any particular program of public education. *Student No. 9* v. *Board of Educ.*, 440 Mass. 752, 754 (2004), does not hold otherwise. There, citing to the capabilities of *Rose*, this court stated that *McDuffy* "held that the Massachusetts Constitution imposes an enforceable duty on the Commonwealth to ensure that all children in its public schools receive an education that is to include certain specific training." The seven "capabilities" listed in *Rose* do not in themselves prescribe a specific curriculum. Thus, in *Student No. 9* v. *Board of Educ., supra,* this court held, among other things, that, "[n]othing in the *McDuffy* decision requires . . . a graduation requirement based on an assessment of multiple subjects." *Student No. 9* v. *Board of Educ., supra* at 765. The dissenting Justices cite *Abbott* v. *Burke*, 153 N.J. 480 (1998) *(Abbott)*, and *Campaign for Fiscal Equity* v. *State*, 100 N.Y.2d 893 (2003) *(CFE)*, to support the position that this court should exercise its authority "to identify the level of spending required" to meet a certain level of education. *Post* at 484 n.5 (Greaney, J., dissenting). Those cases presented dramatically different circumstances than those we face here. In *Abbott* and *CFE*, the respective courts stepped in, only reluctantly, after many years of legislative failure or inability to enact education reforms and to commit resources to implement those reforms, a circumstance not present here. See *Abbott, supra* at 492 ("sixteen years after the start of the Abbott litigation, the [c]ourt found that the continuing constitutional depriva-

---

[29]One scholar notes of these "capabilities" that, "[i]f this standard is taken literally, there is not a public school system in America that meets it." Thro, A New Approach to State Constitutional Analysis in School Finance Litigation, 14 J.L. & Pol. 525, 548 (1998).

tion had persisted too long and clearly necessitated a remedy"; *CFE, supra* at 925 ("We are, of course, mindful . . . of the responsibility . . . to defer to the Legislature in matters of policymaking . . . . We have neither the authority, nor the ability, nor the will, to micromanage education financing"). In sharp contrast, the Massachusetts Legislature and Governor responded to adjudication concerning education with a comprehensive and systematic overhaul of State financial aid to and oversight of public schools. The level of responsive, sustained, intense legislative commitment to public education established on the record in this case is the kind of government action the *Abbott* and *CFE* courts, in the respective underlying cases, had hoped to see from their Legislatures, and reluctantly concluded would not be forthcoming without a detailed court order. See *Abbott, supra* at 490 (noting "judicial involvement in the long and tortuous history of the State's extraordinary effort to bring a thorough and efficient education to the children of its poorest school districts"); *CFE, supra* at 919-925 (documenting State's attempt to distance itself from responsibility for dismal quality of education in New York City public schools).[30]

The plaintiffs further argue that the Commonwealth is in

---

[30]The Massachusetts Constitution may provide greater flexibility to the Legislature concerning educational strategy than more directive provisions contained in the Constitutions of other States. The more directive Constitutions were enacted far later than the education clause in the Massachusetts Constitution. See, e.g., art. 8, § 4, of the New Jersey Constitution ("The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools for the instruction of all the children in the State between the ages of five and eighteen years"). See also art. 9, § 1, of the Florida Constitution (declaring "a paramount duty" of State "to make adequate provision . . . by law for a uniform, efficient, safe, secure, and high quality system of free public schools that allows students to obtain a high quality education and for the establishment, maintenance, and operation of . . . other public education programs that the needs of the people may require"); § 183 of the Kentucky Constitution ("The General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the State"); art 6, § 2, of the Ohio Constitution (Legislature "shall make provisions, by taxation, or otherwise as, with the income arising from the school trust fund, will secure a thorough and efficient system of common schools throughout the State"); art. 9, § 1, of the Washington Constitution (declaring Legislature's duty to make "ample provision for the educations of all children" "*the* paramount duty of the State" [emphasis added]).

violation of the education clause because it has had more than sufficient time since *McDuffy* to bring all students in the Commonwealth to full academic competency, and it has failed to do so. As one of the dissenting opinions point out, the education clause does not "guarantee equal outcomes in all school districts" according to certain measurable criteria. *Post* at 478 (Greaney, J., dissenting). Yet the plaintiffs' frustration with the slow, sometimes painfully slow, pace of educational reform in the focus districts is understandable. I am cognizant that, for the student whose special needs go unaddressed, for the student who sits in an overcrowded classroom or an ill-equipped school library, and for their parents or guardians, the prospect of "better things to come" in public education comes too late. The dissenting Justices point to United States Supreme Court cases interpreting the equal protection and due process clauses of the Federal Constitution to suggest that in declining to order relief now members of this court are "naysayers" who have abandoned the constitutional imperative of *McDuffy*. See *post* at 485, citing *Brown* v. *Board of Educ. of Topeka*, 347 U.S. 483 (1954) (Greaney, J., dissenting); *post* at 492, citing *Brown* v. *Board of Educ.*, *supra*, and *DeShaney* v. *Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189 (1989) (Ireland J., dissenting). I emphatically reject any such conclusion. The court has not been called on to interpret the equal protection and due process provisions of the Massachusetts Constitution, nor are we confronted with the wholesale abandonment of children that the record in those cases evidenced. Here, the independent branches of government have shown that they share the court's concern, and that they are embracing and acting on their constitutional duty to educate all public school students. In contrast to this court's holding in *McDuffy*, I cannot conclude on the record before this court that the Commonwealth is presently neglecting or is likely to neglect its constitutional duties, thus requiring judicial intervention. Cf., e.g., *Michaud* v. *Sheriff of Essex County*, 390 Mass. 523 (1983); *Perez* v. *Boston Hous. Auth.*, 379 Mass. 703, 740 (1980).[31]

The delay in full implementation of the provisions of the act

---

[31]It is instructive to compare today's result with this court's holding in *Bates* v. *Director of the Office of Campaign & Political Fin.*, 436 Mass. 144 (2002). There, the court determined that the Legislature, by failing absolutely

does not derive from legislative or departmental inaction. Cf. *Bates* v. *Director of the Office of Campaign & Political Fin.*, 436 Mass. 144 (2002). Some delays have been occasioned by continued public debate over, opposition to, and protracted litigation over some provisions of education reform. See, e.g., *Student No. 9* v. *Board of Educ.*, 440 Mass. 752 (2004). Some parts of the act, such as foundation budget funding and the implementation of the curriculum frameworks, have been deliberately phased in to permit schools and departments time to adjust to new standards. Still other reforms, as the judge acknowledged, have been slowed by severe revenue shortfalls, which have forced reductions in spending for public education, as well as for other vital public services. We note that, since approximately 2001, Massachusetts has wrestled with a "profound economic downturn." Comprehensive Annual Financial Report at 31 (Dec. 31, 2003). Figures from the Department of Revenue indicate that total tax revenues declined 14.6 per cent in real dollars between FY 2001 and FY 2002, and have not fully recovered. Reserve funds have had to be expended to fund essential services.[32] And the crisis is not over. See Statutory Basis Financial Report at 1 (Oct. 24, 2003) ("Our financial picture will remain cautious for the near future"). Yet through this period the Commonwealth continued to appropriate "substantial sums" toward education reform. See, e.g., *Student No. 9* v. *Board of Educ.*, *supra* at 766 (noting that, in FY 2003 and FY 2004, Legislature voted "substantial sums for intensive remediation programs for those who need them in order to pass the MCAS exam"); Letter of Governor Romney to the Senate and House of Representatives (June 25, 2004) (noting approval of $80 million to increase funding for special education). Because

to appropriate any money to fund a law passed by popular initiative as provided by the Massachusetts Constitution, had failed to comply with the constitutional requirement that it "shall appropriate such money as may be necessary to carry such law into effect." See *id.* at 155 (construing art. 48, The Initiative, II, § 2, of the Amendments to the Massachusetts Constitution).

[32]See, e.g., Statutory Basis Financial Report for 2003 at 4 (Oct. 24, 2002) ("For FY03, expenditures and other uses of budgeted funds continued to exceed revenues and other sources of budgeted funds, resulting in an operating deficit of $451.9 million"); Statutory Basis Financial Report at 2 (Oct. 25, 2002) (noting transfer of over $1 billion from Commonwealth Stabilization Fund and transfers from other funds to General Fund).

decisions about where scarce public money will do the most good are laden with value judgments, those decisions are best left to our elected representatives.

Implementation of change, fundamental, sweeping change, such as that mandated by the Education Reform Act, is seldom easy. When change is directed at a system as complex and multi-dimensional as public education, where the theories and methodologies of education reform are so varied,[33] and when reforms must apply to hundreds of towns and municipalities spread across a Commonwealth — localities that include small villages and large cities, communities of new immigrants (many of whom speak no English), and long-established residents, wealthy neighborhoods and those in which far too many families struggle every day to feed and clothe their children — change must be measured over years. The evidence here is that the Commonwealth's comprehensive Statewide plan for education reform is beginning to work in significant ways.

I turn last to the remedy of ordering a cost study, which the dissenting Justices would impose. The Superior Court judge recommended that this court order the department to undertake a wide-ranging study.[34] She further recommended that the department be ordered to "implement whatever funding and administrative changes result from" the adoption of certain educational policies. Contrary to the view of the dissenting Justices, the study would be problematic on at least three counts. First, a cost study itself is likely to retard rather than advance the progress of educational reform. It would divert substantial

---

[33]The judge's summary of the testimony of expert witness testimony offered by both parties provides a useful illustration of the wide range of educational theories and methodologies from which policymakers must choose.

[34]The judge identified policies that "*must* be covered" (i.e., "special education, including the cost of comprehensive professional development for all regular education, as well as special education teachers who teach students with disabilities"); implementation of "all seven of the curriculum frameworks," including health, arts, and foreign languages; "adequate school facilities"; and free preschool for all three and four year old children "at risk." Those policies she recommended "*should* be considered" include increases in teaching salaries and other foundation budget categories; class sizes under twenty children for at least preschool through grade three; "adequately stocked, computer equipped, and staffed school libraries"; and "remedial tutoring, extended day, extended year programs, or a combination of them." (Emphasis supplied.)

time and resources from the task of education reform and would needlessly duplicate in many respects the fine work done by the judge.

Second, the study the dissenting Justices would order is rife with policy choices that are properly the Legislature's domain. The study would assume, for example, that in order to fulfil its constitutional obligation under the education clause, the Commonwealth "must" provide free preschool for all three and four year old children "at risk" in the focus districts, and presumably throughout the Commonwealth thereafter. That is a policy decision for the Legislature. In fact, as I noted previously, see note 23, *supra*, the Legislature recently determined to place more emphasis on early childhood education. Other programs might be equally effective to address the needs of at risk students, such as remedial programs (policy choices that in the judge's view should not be a mandatory component of public education, see note 35, *infra*), nutrition and drug counselling programs, or programs to involve parents more directly in school affairs. Each choice embodies a value judgment; each carries a cost, in real, immediate tax dollars; and each choice is fundamentally political.[35] Courts are not well positioned to make such decisions. See *post* at 484 (Greaney, J., dissenting) (acknowledging "the complexity of education policy in general[,] and the disagreement between competent experts on how best to remediate a nonperforming or poorly performing school district"). It is for these reasons that "we leave it to the [Governor] and the Legislature[] to define the precise nature of the task which they face in fulfilling their constitutional duty to educate our children today, and in the future." *McDuffy, supra* at 620.

Finally, and most significantly, the study would not be a final order, but a starting point for what inevitably must mean judicial directives concerning appropriations. The Superior Court judge recognized that the ultimate purpose of a study would be to

[35]Although the judge determined that local management problems were a principal cause of poor performance in the focus districts, the proposed study endorsed by the dissenting Justices is silent on the issue of what is required — in funds and other support — to improve the failing administrative and financial management that currently deprives students in the focus districts of the educational opportunities they deserve.

channel more money to the focus districts. Her order would encompass not only a study, but a directive to the department to "implement whatever funding and administrative changes" the study concluded were necessary to meet its educational goals.

The dissenting Justices endorse only the judge's proposed study and reject her proposal that the department be ordered to implement the necessary changes. They then state that their remedy "has nothing to do with orders for the appropriation of money." *Post* at 484 (Greaney, J., dissenting). What ails our failing schools cannot be cured by a study. And one cannot gloss over the difficult issue of forcing the Legislature to appropriate more money, see *id.*, with the assertion that, "[i]f money is needed, and it is not forthcoming, there will be ample time to discuss the matter of appropriations later in a cooperative and nonadversary way." *Id.* No one reading the judge's report can be left with any doubt that the question is not "if" more money is needed, but how much. Endorsing one aspect of her recommendation (a study) and rejecting the other (the directive to "implement" additional funding) will not cure the constitutional violation the dissenting Justices perceive, and merely evades the true complexities of the issue. Certainly, whether the legislative and executive branches are meeting their constitutional duty is not a matter for "nonadversary" "discussion" between judges and members of the General Court.

The Governor, the Legislature, and the department are well aware that the process of education reform can and must be improved. The board, for example, recently enacted rules to streamline and accelerate the process for intervening in schools identified to be "chronically underperforming." See 603 Code Mass. Regs. §§ 2:00 (Aug. 24, 2004). The amply supported findings of the judge reflect much that remains to be corrected before all children in our Commonwealth are educated. The Legislature may well choose to rely on these findings as it continues to consider efforts to improve public education. Her findings are also a testament to the many educators, teachers, parents, business and community leaders who insist that, until that goal is reached, they will continue to demand improvement

and will seek the help of our elected officials to ensure that meaningful reform is ongoing.

"The presumption exists that the Commonwealth will honor its obligations." *Bromfield* v. *Treasurer & Receiver Gen.*, 390 Mass. 665, 669 (1983). I am confident that the Commonwealth's commitment to educating its children remains strong, and that the Governor and the Legislature will continue to work expeditiously "to provide a high quality public education to every child." G. L. c. 69, § 1. I reaffirm the court's holding in *McDuffy*. The education clause, Part II, c. 5, § 2, of the Massachusetts Constitution, "impose[s] an enforceable duty on the magistrates and Legislatures of this Commonwealth to provide education in the public schools for the children there enrolled, whether they be rich or poor and without regard to the fiscal capacity of the community or district in which such children live." *Id.* at 621. It remains "the responsibility of the Commonwealth to take such steps as may be required in each instance effectively to devise a plan and sources of funds sufficient to meet the constitutional mandate." *Id.*


CowIN, J. (concurring, with whom Sosman, J., joins). I concur in the decision by the court today because the plaintiffs have not demonstrated that the Commonwealth has violated Part II, c. 5, § 2, of the Massachusetts Constitution, the "education clause." I write separately to articulate what I believe is the proper scope of the education clause and the limited role this court should have in public policy debates of the type presented here.

*The scope of the education clause.* The Constitution is a structural document that confers on the various branches of government broad areas of authority, see generally Part II, c. 1 ("The Legislative Power"); Part II, c. 2 ("Executive Power"); Part II, c. 3 ("Judiciary Power"), and guarantees for the citizens that the government will not interfere with certain basic rights. See generally Part the First ("A Declaration of the Rights of the Inhabitants of the Commonwealth of Massachusetts"). In securing rights and dividing powers, our Constitution protects citizens against government encroachment and provides a broad organiza-

tional framework for our Commonwealth. See, e.g., art. 1, as amended by art. 106 of the Amendments of the Massachusetts Constitution ("Equality under the law shall not be denied or abridged . . ."); art. 2 ("no subject shall be hurt, molested, or restrained, in his person, liberty, or estate, for worshipping GOD"); art. 14 ("Every subject has a right to be secure from all unreasonable searches . . ."); art. 16, as amended by art. 77 of the Amendments of the Massachusetts Constitution ("The right of free speech shall not be abridged"). See also Part II, c. 1, § 1, art. 4 ("full power and authority are hereby given and granted to the said general court, from time to time, to make, ordain, and establish, all manner of wholesome and reasonable orders, laws, statutes, and ordinances"). Even where our Constitution explicitly provides for a legislative role in the enactment of laws or appropriation of funds, it generally confers on the General Court only the power or authority to enact or appropriate, but falls short of requiring that any specific action be taken. See, e.g., art. 49, as amended by art. 97 of the Amendments to the Constitution of Massachusetts ("The general court shall have *the power* to enact legislation necessary or expedient to protect [the people's right to clean air and water] [emphasis added]); art. 41, as amended by art. 110 ("Full *power and authority* are hereby given and granted to the general court to prescribe for wild or forest lands . . . such methods of taxation as will develop and conserve the forest resources . . . " [emphasis added]). I can find no Constitutional provision explicitly mandating the creation of specified public programs or services.

In the past, we have respected these intentional limitations in our Constitution. As we stated in *Cohen* v. *Attorney Gen.*, 357 Mass. 564, 570-571 (1970), quoting *Tax Comm'r* v. *Putnam*, 227 Mass. 522, 523-524 (1917), and *Attorney Gen.* v. *Methuen*, 236 Mass. 564, 573 (1921):

> "The Constitution of Massachusetts is a frame of government for a sovereign power. It was designed by its framers and accepted by the people as an enduring instrument, so comprehensive and general in its terms that a free, intelligent and moral body of citizens might govern themselves under its beneficent provisions through radical

changes in social, economic and industrial conditions. It declares only fundamental principles as to the form of government and the mode in which it shall be exercised . . . . It is a statement of general principles and not a specification of details.' . . . 'It ordinarily is not long, complicated nor detailed and does not descend to the minute particulars appropriate to a statute. Its phrases are chosen to express generic ideas, and not nice shades of distinction."

See *Brookline* v. *Secretary of the Commonwealth*, 417 Mass. 406, 419 (1994); *McDuffy* v. *Secretary of the Executive Office of Educ.*, 415 Mass. 545, 559 (1993) (*McDuffy*).

It is inconsistent therefore with the general structure of our Constitution to interpret the education clause as imposing an enforceable duty on the Commonwealth to create and maintain the kind of highly complex and intricate public school establishment that the Chief Justice's concurring opinion today would presume. Instead, the clause should be construed as a broad directive, intended to establish the central importance of education in the Commonwealth and clarify that the legislative and executive branches will be responsible for the creation and maintenance of our public school system. See Part II, c. 5, § 2 ("it shall be the duty of legislatures and magistrates,[1] in all future periods of the commonwealth, to cherish the interests of literature and the sciences . . . [and] public schools and grammar schools in the towns . . ."). For the full text of the clause, see *ante* at 430 n.1] (Marshall, C.J., concurring). While I do not debate that the clause presumes the establishment of some public schools by the legislative and executive branches, nowhere in its text does the clause mandate any particular action on the part of the Commonwealth, or confer any role on the judiciary to enforce it. Public education is a government service, the organization and finance of which is to be determined by the executive and legislative branches.

Nonetheless, in *McDuffy*, *supra* at 610-611, 614, this court determined from the broad language of the education clause

---

[1]The Constitution uses the term "magistrates" to refer to officials of the executive branch. See *McDuffy* v. *Secretary of the Executive Office of Educ.*, 415 Mass. 545, 561 n.16 (1993) (*McDuffy*).

that the Commonwealth was failing to meet a judicially enforceable duty to educate. I believe the *McDuffy* opinion read too much into the education clause, and that the Chief Justice's concurring opinion erroneously endorses that aspect of the decision. See *ante* at 434-435, 462. Even assuming that the education clause imposes some continuing duty on the Commonwealth to support a public education system, it clearly does not guarantee any particular level of educational success or mandate specific programmatic choices. In a display of stunning judicial imagination, the *McDuffy* court used its already bold reading of the education clause to include specific programmatic "guidelines" for the Commonwealth to follow (the seven *McDuffy* "capabilities") in an attempt to guarantee future levels of scholastic achievement in specific curriculum areas. *McDuffy, supra* at 618-619. The *McDuffy* court fashioned these guidelines from a constitutional directive that only speaks of "cherish[ing]" education, under the guise of constitutional "interpretation." *Id.* at 558-559. To read specific mandates, or even guidance, into the education clause is unsupportable. The clause no more guarantees certain educational results for the children of the Commonwealth than it guarantees any measure of success in any other category that the same section instructs the Legislature to promote — "humanity," "general benevolence," "industry," "charity," "frugality," "honesty," "punctuality," "sincerity," "good humor," "social affections," and "generous sentiments among the people." See Part II, c. 5, § 2. See *Doe* v. *Superintendent of Schs. of Worcester*, 421 Mass. 117, 129 (1995) (Constitution does not "guarantee[] each individual student the fundamental right to an education"). The Massachusetts General Laws, not the Declaration of Rights, structure our government programs, provide for their content, and establish minimum levels of attainment — this holds true for government services ranging from our educational system to our public ways.

Therefore, I believe that if *McDuffy* is to stand at all, its overreaching "guidelines" should be rejected and the opinion should be limited to its most generalized holdings: that the education clause creates "a duty to provide an education for *all* [the Commonwealth's] children, rich and poor, in every city and town,"

*McDuffy, supra* at 606, and that the Commonwealth (not this court) must "devise a plan and sources of funds sufficient to meet the constitutional mandate." *Id.* at 621. Unfortunately, we have missed an opportunity to limit *McDuffy* to its proper sphere. Under a more limited reading of *McDuffy*, assuming there is some enforceable duty imposed by the education clause, the Commonwealth has more than fulfilled its obligations. In the twelve years since *McDuffy*, the Legislature passed the Education Reform Act, see generally G. L. cc. 69-71, and spent billions of dollars toward realizing its goals. That is certainly enough under our broad constitutional directive to satisfy the mandate that the Commonwealth "cherish" our public schools.

*The courts' role in educational policymaking.* Even if the education clause is to be interpreted as imposing some duty upon the Commonwealth to maintain a public school establishment, a conclusion which is by no means apparent, our Constitution requires that the duty be fulfilled by the legislative and executive branches, without oversight or intrusion by the judiciary. The education clause itself explicitly leaves to the legislative and executive branches responsibility for determining the form and scope of its obligations. See Part II, c. 5, § 2. Where the drafters explicitly conferred authority on only two of the branches of government, we cannot ordain the third branch "overseer."

In addition to the clause's explicit language conspicuously omitting any reference to the judicial branch, the overarching doctrine of the separation of powers prohibits judicial intervention in otherwise discretionary functions of the executive and legislative branches. See art. 30 of the Massachusetts Declaration of Rights ("the judicial shall never exercise the legislative and executive powers, or either of them"). See, e.g., *Bates* v. *Director of the Office of Campaign & Political Fin.*, 436 Mass. 144, 183 (2002) (Appendix) (Cowin, J., dissenting to order entered Jan. 25, 2002), quoting *Commonwealth* v. *Leno*, 415 Mass. 835, 841 (1993) ("Article 30's principle of separation of power prevents the 'judiciary [from] substituting its notions of correct policy for that of a popularly elected Legislature' "); *Matter of McKnight*, 406 Mass. 787, 792 (1990) ("A court . . .

may not properly exercise the functions of the executive branch of State government"). This case presents none of the extraordinary circumstances that might warrant an exception to this general rule. Contrast, e.g., *Judge Rotenberg Educ. Ctr., Inc.* v. *Commissioner of the Dep't of Mental Retardation (No. 1)*, 424 Mass. 430, 446-447, 465 (1997); *Matter of McKnight, supra* at 801-802; *Attorney Gen.* v. *Sheriff of Suffolk County*, 394 Mass. 624, 630, 631 (1985); *O'Coin's, Inc.* v. *Treasurer of the County of Worcester*, 362 Mass. 507, 509-510 (1972). Indeed, the constitutional requirement that the judiciary stay out of the business of educational policy is echoed in our well-established rule that "[a]llocation of taxpayer dollars, especially in times of limited fiscal resources, is the quintessential responsibility of the popularly-elected Legislature, not the courts." *County of Barnstable* v. *Commonwealth*, 410 Mass. 326, 329 (1991). See *Bromfield* v. *Treasurer & Receiver Gen.*, 390 Mass. 665, 670 n.9 (1983), quoting *Opinion of the Justices*, 302 Mass. 605, 612 (1939). "[A]ny attempt by this court to compel the Legislature to make a particular appropriation . . . would violate art. 30." *Commonwealth* v. *Gonsalves*, 432 Mass. 613, 619 (2000). Where, as here, the remedy for an alleged deprivation would require a court to order the Commonwealth to spend money that the Legislature has not appropriated, judicial intervention is not permitted. We must be mindful that "[n]ot every violation of a legal right gives rise to a judicial remedy." *Bates* v. *Director of the Office of Campaign & Political Fin., supra* at 168-169. These separation of powers principles are applicable even where parties assert constitutional violations. See *LIMITS* v. *President of the Senate*, 414 Mass. 31, 35 (1992) ("a judicial remedy is not available whenever a joint session fails to perform a duty that the Constitution assigns to it"). There we declined to intrude in the political debate over term limits:

> "The courts should be most hesitant in instructing the General Court when and how to perform its constitutional duties. Mandamus is not available against the Legislature. . . . Th[e] principles [of separation of powers] call for the judiciary to refrain from intruding into the power and function of another branch of government . . . . Restraint

is particularly appropriate here where [the Constitution] . . . gives to the courts no enforcement role."

*Id.*

The *McDuffy* court cast aside this separation of powers doctrine and improperly inserted a final layer of judicial review on top of the public policy debate over education. While the Chief Justice's concurring opinion suggests a discomfort with the breadth of our reading of the education clause in *McDuffy*, see *ante* at 431-454, and an awareness of separation of powers principles, see *ante* at 444-445, 456, 457, 459-461, it would suppress these concerns and embrace McDuffy's judicially constructed authority. Her concurring opinion today engages in a lengthy and inappropriate review of the Superior Court judge's findings for "clear error." *Ante* at 444-451. The very fact of this review is symptomatic of a misunderstanding of this court's role in what is a legislative and executive matter.[2] The Chief Justice's articulation of this court's task in reviewing the record underscores a deep misapprehension concerning the court's proper function. In its own words, the Chief Justice's concurring opinion undertakes to "assess[] whether this record of considerable progress, marred by areas of real and in some instances profound failure, offends the education clause." *Ante* at 453. Through an artful review of the Superior Court judge's findings for "clear error" followed by an effective rejection of her conclusions, the Chief Justice's concurring opinion avoids the need to deal with *McDuffy's* intrusive and flawed analysis. If the Chief Justice and those Justices who joined with her are concerned about a self-imposed position at the helm of this debate, they should reject much or all of *McDuffy*. If, on the

[2]Although I criticize the treatment of the Superior Court judge's lengthy findings and conclusions in the Chief Justice's concurring opinion, the fault here does not lie with the Superior Court judge, who superbly analyzed the overwhelming body of evidence before her. Given our opinion in *McDuffy*, the judge undertook a logical analysis and produced meticulous and scholarly findings. Unfortunately, because our opinion in *McDuffy* mistakenly interjected judicial review where it does not belong, the judge's laudable efforts are for naught. The very level of detail and comprehensiveness of her findings and conclusions indicates that we have gone far astray in assuming a role in the education debate.

other hand, they are comfortable with the prospect of determining whether the Commonwealth's educational reforms and expenditures have produced satisfactory results, they should accord the trial judge's findings and conclusions their due deference.

Instead, the Chief Justice's concurring opinion would fashion a new constitutional standard virtually ensuring that the courts will be tangled at the epicenter of our educational policy debate for the foreseeable future. Her concurring opinion proclaims: "Where the Governor and the Legislature establish, exercise ultimate control over, and provide substantial and increasing (subject only to dire fiscal circumstances) resources to support, public education in a way that minimizes rather than accentuates differences between communities based on property valuations, constitutionally impermissible classifications, and other criteria extrinsic to the educational mission . . . we [the Chief Justice, joined by Justices Spina and Cordy,] cannot conclude that they are presently violating the education clause." *Ante* at 454. This standard inappropriately and inexplicably injects an equal protection analysis where the parties do not claim any violation of equal protection guarantees and there is no evidence of discrimination in the record. I do not dispute that, had there been evidence of an equal protection violation in the provision of public education, this court would have the authority under our equal protection doctrine to order an appropriate remedy. However, where the plaintiffs only claim widespread deficiencies in the public school system under the education clause, remedies must come from the legislative and executive branches.

Further cementing our continued encroachment in this debate, the Chief Justice suggests that nothing said today "will insulate the Commonwealth from a successful challenge under the education clause in different circumstances." *Ante* at 435. Given this invitation, we may very well be asked some day to determine whether myriad future changes to educational programs, or to the level of support or nature of resources provided by the Governor and Legislature, "minimize[] rather than accentuate[]" differences. *Ante* at 454. And how will courts answer these questions? As the Superior Court judge's hard work foreshadows,

courts will examine voluminous records filled with data on educational outcomes. This cannot be the role that the Constitution envisioned for the judiciary. This court is not a "super Legislature" empowered to review the work of the duly elected members of the General Court. And the constitutionality or unconstitutionality of the Commonwealth's actions are not to be found at the end of a road paved with endless inquiries and thousands of judicial findings.

Justice Greaney, in his dissent, argues that our doctrine of stare decisis requires that we suppress these concerns and reaffirm *McDuffy* in its totality. See *post* at 482-485. While he acknowledges that "[s]tare decisis is not a rigid requirement," *post* at 482, he would nonetheless have us adhere uncompromisingly to a decision which, from its genesis, overstepped the limits imposed on this court by our Constitution.[3] This approach misconstrues our rule of stare decisis. Certainly this court must not indulge trivial shifts in our constitutional interpretation. See *post* at 483. However, when we are called on to revisit a decision, no matter how recently decided or thoughtfully drafted, that is plainly wrong in an area of such constitutional significance as our separation of powers doctrine, we must not let our desire for consistency overpower our commitment to the intellectual honesty of our jurisprudence. Stare decisis, while an unquestionably important pillar of our judicial system, does not require slavish adherence to unconstitutional precedent. See *Payne* v. *Tennessee*, 501 U.S. 808, 827 (1991), quoting *Smith* v. *Allwright*, 321 U.S. 649, 665 (1944) ("when governing decisions are unworkable or are badly

---

[3]As an initial matter, the principles of stare decisis need not prevent this court from limiting our far-reaching opinion in *McDuffy*. Much of what I take issue with in the *McDuffy* opinion was dicta in the form of "guidelines" for future legislative action. See *McDuffy*, *supra* at 618-619 (setting forth seven "capabilities"). The *McDuffy* court took no action explicitly ordering the Legislature to enact its seven capabilities. See *id.* at 618 ("we shall articulate broad guidelines and assume that the Commonwealth will fulfil its duty to remedy the constitutional violations that we have identified"). Nor did the court declare any act of the Legislature unconstitutional. *Id.* at 621. Now, faced with the request to take more specific action, the court today could, but does not, rein in *McDuffy* by rejecting its dicta concerning the seven capabilities and its retention of future judicial oversight without squarely overruling its basic holding.

reasoned, 'this Court has never felt constrained to follow precedent' ''); *Vasquez* v. *Hillery*, 474 U.S. 254, 266 (1986) (recognizing exception to stare decisis for precedents that have proved "unworkable, or otherwise legitimately vulnerable to serious reconsideration"). "*Stare decisis* is not an inexorable command; rather, it 'is a principle of policy and not a mechanical formula of adherence to the latest decision.' . . . This is particularly true in constitutional cases . . . ." *Payne* v. *Tennessee, supra* at 828, quoting *Helvering* v. *Hallock*, 309 U.S. 106, 119 (1940). Were stare decisis an absolute rule, we would not have the benefit today of many landmark Supreme Court decisions that vindicated cherished rights after centuries of neglect and corrected misguided judicial decisions to conform to the dictates of the Constitution. Perhaps the most well-known example was the Supreme Court's opinion in *Brown* v. *Board of Educ. of Topeka*, 347 U.S. 483 (1954), squarely overruling the "separate but equal" doctrine of *Plessy* v. *Ferguson*, 163 U.S. 537 (1896). Also of note is *Gideon* v. *Wainwright*, 372 U.S. 335 (1963), which overruled *Betts* v. *Brady*, 316 U.S. 455 (1942), and established that the constitutional right to counsel under the Sixth Amendment to the United States Constitution was applicable to the States through the Fourteenth Amendment to the United States Constitution. In *Mapp* v. *Ohio*, 367 U.S. 643 (1961), the Court determined that evidence obtained by an unconstitutional search was inadmissible in State prosecutions, rejecting its earlier opinion in *Wolf* v. *Colorado*, 338 U.S. 25 (1949). And there are other examples. See, e.g., *United States* v. *Darby*, 312 U.S. 100 (1941) (holding that Congress has power to exclude products made in violation of wage and hour limits from interstate commerce and overruling *Hammer* v. *Dagenhart*, 247 U.S. 251 [1918], among other cases); *West Coast Hotel Co.* v. *Parrish*, 300 U.S. 379 (1937) (overruling *Adkins* v. *Children's Hosp. of D.C.*, 261 U.S. 525 [1923], and finding minimum wage laws are not an unconstitutional burden on the right to contract). My belief that the *McDuffy* opinion should be limited in no way disparages the Supreme Court's decision in *Brown* v. *Board of Educ. of Topeka, supra*. To the contrary, I would honor the *Brown* Court's

understanding that, where the Constitution commands it, stare decisis must yield.

Education is an emotional issue for many. Equally, it is a topic characterized by numerous and legitimate differences of opinion concerning the course of action most likely to improve our schools and prepare our children for bright futures. Often, these disagreements about education concern how much money to spend and how best to spend it. The issue of public education is thus no different from our political controversies concerning whether we should invest more money in our public transportation system or our roads, how much money we ought to allocate for environmental preservation, and the amount we should provide in public assistance to low-income individuals and families. In other words, the controversy before us today is largely a funding debate. Choices regarding how much money to spend and how to spend it are in every instance political decisions left to the Legislature, to be arrived at with input from the executive branch and the citizenry; they should not be the result of judicial directives. Our Constitution, in separating judicial functions from legislative and vice versa, restricts policymaking to its intended branch. See generally Part II, c. 1, § 1, art. 4.

Furthermore, there are practical reasons why the courts should refrain from interfering with this design in the hopes of improving our schools. The courts, insulated from the political fray as we are for good reason, are ill suited to craft solutions to complex social and political problems. Unlike State legislators and their staffs, judges have no special training in educational policy or budgets, no funds with which to hire experts in the field of education, no resources with which to conduct inquiries or experiments, no regular exposure to our school system, no contact with the rank and file who have the task of implementing our lofty pronouncements, and no direct accountability to the communities that house our schools. Had this lawsuit been successful and this court were once again to fashion a judicial remedy, the elected officials who, pursuant to our Constitution, ought to bear the ultimate burden of resolving our current educational debate would have been insulated from public accountability. The more this court interferes in policymaking

and political funding debates, the more we allow the Legislature to avoid difficult questions, and the more our citizens get accustomed to turning to the courts for solutions rather than to their elected officials. As I said in *Bates* v. *Director of the Office of Campaign & Political Fin.*, 436 Mass. 144, 185 (2002) (Appendix) (Cowin, J., dissenting to order entered Jan. 25, 2002), "[t]he plaintiffs' remedy, as it always is with political questions, is at the ballot box."

GREANEY, J. (dissenting, with whom Ireland, J., joins). As the only remaining member of the court who participated in *Mc-Duffy* v. *Secretary of the Executive Office of Educ.*, 415 Mass. 545 (1993) (*McDuffy*), and as the single justice who has supervised these proceedings over several years, I write separately for the following reasons: to emphasize the nature and rule of the *McDuffy* case; to point out again the crisis that exists in the four focus districts before us; to explain how the court can and should remain involved in the proceedings without impermissibly intruding on legislative or executive prerogatives; and to express regret that the court has chosen to ignore the principles of stare decisis, thereby effectively abandoning one of its major constitutional precedents.

a. *McDuffy* was released with the court's knowledge that the Legislature was poised to enact the Education Reform Act of 1993 (ERA). See St. 1993, c. 71. The *McDuffy* decision, the adoption of the ERA, and the Governor's signing of the ERA into law were harmonious and contemporaneous events that, on the one hand, stated in *McDuffy* (after comprehensive research of original and modern sources) the constitutional obligation to provide a minimally adequate education for the Commonwealth's children and, on the other hand, put into place measures to satisfy that obligation. Thus, the three events comprised in fact and law a joint enterprise on the part of the three branches of government to seek and compel change and improvement. Over the past decade, *McDuffy* has never been understood to constitute anything less. And, as emphasized by Justice Ireland, *post* at 486, and acknowledged by the Chief Justice, *ante* at

434-435, the obligation stated in *McDuffy* is mandatory and not one which can later be recast as more or less aspirational.

b. By any standard, the extensive findings made by the Superior Court judge conclusively establish that the constitutional imperative of *McDuffy* is not being satisfied in the four focus districts, when they are examined objectively against the three comparison districts. The factual record establishes that the schools attended by the plaintiff children in the focus districts are not currently implementing the Massachusetts curriculum frameworks in any meaningful way, nor are they otherwise equipping their students with the capabilities delineated in *McDuffy* as the minimum standard by which to measure an educated child. See *McDuffy*, *supra* at 618-619, 621. The judge's decision, reached after a lengthy adversarial trial, documents in comprehensive detail a disturbing state of affairs in the schools of the four focus districts. The following is but a partial recitation of the judge's findings.

Acute inadequacies exist in the educational programs of the four focus districts in the core subjects of English language arts, mathematics, science and technology, and history. In Lowell, a large percentage of elementary school students are reading below grade level. One middle school has insufficient textbooks and supplementary reading materials to accommodate all of its students and no specialized reading teachers at all to assist those students who are reading below grade level. Lowell High School has many students who read below grade level, and thirty to forty per cent of its students lack fluency in English. The school, however, has no funds to create a formal reading program. In Springfield, thirty-six per cent of fourth graders at one elementary school failed the English Language Arts (ELA) Massachusetts Comprehensive Assessment System (MCAS) test in 2002. A significant number of its fifth grade students enter middle school reading two and one-half (or more) years below grade level. There is, nevertheless, only one reading resource teacher to serve all six of Springfield's middle schools. An astounding seventy per cent of Springfield's seventh graders scored below the proficient level on the ELA MCAS test in 2003, and the same dismal percentage of tenth graders failed to achieve proficiency on the ELA MCAS test.

All four of the focus districts have difficulty attracting and

retaining certified mathematics teachers. As a result, only fifty per cent of Brockton's middle school mathematics teachers were appropriately certified in 2002 and only thirty-five per cent in 2003. At the high school, twenty-seven per cent of Brockton's mathematics teachers were not certified to teach high school mathematics in 2003. In Winchendon, none of the seventh and eighth grade mathematics teachers is appropriately certified. Only one of three middle school science teachers is certified, but there is no professional development in Winchendon devoted to science instruction. Winchendon cannot provide the range of science courses necessary to meet the needs of students interested in applying to a four-year college. Ninety-five per cent of Winchendon students scored at the warning-failing or needs improvement level on the eighth grade history MCAS test. Winchendon's reading, math, science, and social studies programs are not aligned with the State curriculums framework. Although the State science framework contemplates instruction in a laboratory setting, four of the six middle schools in Springfield lack science laboratories altogether, and those that do exist do not all have running water or electrical outlets. Only one-half of Springfield's elementary schools have a science teacher. The science curriculum framework was adopted in 2001, but many of Springfield's high school science textbooks are ten years old. The science supply budget for the district as a whole has been $2 per student for the last fifteen years, an amount that is utterly insufficient to implement the framework.

Even larger weaknesses are apparent in the areas of health, the arts, and foreign languages. In 2003, the elementary and middle schools in Lowell had a per pupil arts expenditure budget of $1.63. Twenty-seven art teachers, thirty-one music teachers, and four theater teachers in Springfield serve a student population of 26,000, and it was estimated that fully one-half of the students in Springfield's graduating class of 2003 went through twelve years of public school without any arts instruction at all. Although Lowell and Springfield have student populations with numerous and serious health issues, including alcohol and marijuana abuse, poor nutrition, high obesity rates, high teenage pregnancy rates, HIV, and domestic violence, neither district has the resources or staff to provide its students with the level of

instruction contemplated by the State health curriculum framework. In Brockton, forty-two per cent of its foreign language teachers in the middle school, and twenty-five per cent of its foreign language teachers in the high school, are not certified in the languages they teach.

Libraries in all four of the focus districts lack sufficient staff, an adequate number of current titles and periodicals, and computer resources necessary to equip students with research skills contemplated by the curriculum frameworks. All four focus districts have been designated by the Department of Education (department) as "high needs" school districts with respect to technology, and none has met benchmarks set by the department pertaining to the availability of modern, fully functioning computer equipments or the staff to service them.

All four focus districts have difficulty servicing children referred for special education, due primarily to a lack of psychologists able to perform the necessary evaluations. All lack sufficient space to provide special education services in appropriate settings and fail to provide students with disabilities with meaningful access to the regular education curriculum in regular education classrooms. Children with disabilities in the focus districts suffer from the absence of meaningful professional development both for regular education teachers on teaching special needs students and for special education teachers on subject matter content areas that children with disabilities need to learn. All of the focus districts lack sufficient personnel to support and assist children with disabilities in regular education classrooms. In 2003, the percentage of special education students who passed the tenth grade math MCAS test in the focus districts ranged from twelve to twenty-five per cent. The percentage of special education students in the focus districts who passed the tenth grade ELA MCAS test was twenty-four to fifty.[1] In all four focus districts the scores of students at risk, including students with disabilities, racial and ethnic minority

---

[1] These scores are far below those of students with disabilities in the comparison districts. In 2003, seventy-nine to eighty-two per cent of special education students in Brookline and Wellesley passed the tenth grade math MCAS test and ninety-two to ninety-four per cent passed the tenth grade ELA MCAS test. Statewide, fifty percent of special education students passed the tenth grade math MCAS test and sixty-seven per cent passed the tenth grade

students, limited English proficient students, and low-income students, were shockingly low and substantially lower than the scores of regular education students.

Each of the four focus districts runs a public school preschool program of high quality, but their programs serve only a fraction of all of the three and four year olds who would attend if there were sufficient resources and adequate space. Brockton serves only ten per cent of its three and four year olds; Lowell serves about thirteen per cent; Springfield serves less than thirty per cent; and Winchendon serves about one-third. Twenty-five per cent of kindergarten students in Brockton and Lowell, and close to forty per cent of kindergarten students in Springfield, tested more than one standard deviation below the norm in terms of receptive vocabulary acquisition, "a sign of children who are at considerable risk of school failure because they are already so far behind the starting gate." Because of budget reductions in recent years, however, each of the focus districts has had to cut back on its programs directed toward early childhood education.

In summary (and without attempting to include many other negative findings that add to what is stated above), the judge's report paints a "bleak portrait of the plaintiffs' schools" that is remarkably similar to what the *McDuffy* court found eleven years ago. *Id.* at 617. The judge examined a number of objective criteria used by the department as indicators of education program quality: MCAS scores, dropout rates, retention rates, on-time graduation rates, SAT scores and SAT participation rates, and the postgraduation plans of high school seniors. She concluded that, on almost every objective indicator, the four focus districts have, with few exceptions, not improved at all since 1993, and "if one concentrates particularly on the last five years, when one would expect at least to begin seeing the impact of ERA investments, there are almost no exceptions." She concluded that public school students in the plaintiffs' districts are offered significantly fewer educational opportunities, and a

ELA MCAS test. The judge accepted the opinion of every educator and expert witness who testified on the subject, that all students with noncognitive disabilities are capable of performing at the same level as their regular education peers, provided they have adequate support.

lower quality of educational opportunities, than are students in the schools of the comparison districts and, on average, than are students in the Commonwealth in the whole. Despite the many positive changes effected by the ERA, the conclusion· is inevitable that the four focus districts are failing to equip their students with the capabilities described in *McDuffy* as necessary to become free and productive citizens of the Commonwealth. Moreover, even within the four focus districts, those children demonstrating the greatest needs typically receive less than other students of average needs. We have then between the focus districts and the comparison districts a tale of two worlds: the focus districts beset with problems, and lacking anything that can reasonably be called an adequate education for many of their children, the comparison districts maintaining proper and adequate educational standards and moving their students toward graduation and employment with learned skills necessary to achieve in postgraduate education and function in the modern workplace.

c. The plaintiffs' situation requires relief by this court. Creating academic standards that are national models cannot be deemed constitutionally appropriate if those standards cannot be implemented in the focus districts where funding is inadequate. Further, creating a rigorous student assessment system cannot be deemed constitutionally appropriate when a majority of students in the focus districts are scoring at the failing-warning, or needs improvement level, under that system. Similarly, raising certification standards for teachers cannot be deemed satisfactory when schools cannot attract, pay, or retain certified teachers. Changes effected by the Legislature and the department since 1993 have been laudable. These changes, however, ultimately must be judged on results and not on effort (no matter how praiseworthy), and as pointed out by Justice Ireland, the Commonwealth's insistence to the contrary seeks, in effect, to overrule *McDuffy. Post* at 487.

I do not suggest that the Commonwealth must guarantee equal outcomes in all school districts with regard to such measures as MCAS scores, graduation rates, and college admissions (although these certainly would be inspirational goals). The Commonwealth's constitutional duty to educate its children

will not be fulfilled, however, until all of its students have a reasonable opportunity to acquire an adequate education, within the meaning of *McDuffy*, in the public schools of their communities. This, as the judge's report meticulously documents, the Commonwealth has failed to do in the four focus districts.[2] Moreover, there is no evidence whatsoever to justify the Chief Justice's optimism that considerable progress in the focus districts is being made.[3] *Ante* at 453. To the contrary, the judge's report, read as a whole, documents a startling and dismal performance gap between the Commonwealth's privileged and underprivileged children (the hardest and costliest to educate) that continues to hold its course.

I would adopt the judge's recommendation that we order the department promptly to conduct a study to assess the actual costs of effective implementation of the educational programs intended to provide an adequate education in the four focus districts. No persuasive consensus exists regarding how much spending is necessary to provide an "adequate" education. Actual spending levels strongly suggest, however, that the formula now relied on by the department to reflect the minimum amount each district needs to provide an adequate education to its students does not reflect the true cost of successful education in the Commonwealth, at least in the focus districts. Between fiscal years 2001 and 2003, each focus district's actual net school spending was at or only slightly above its foundation budget. In contrast, the seventy-five school districts that perform the highest on the MCAS tests spend, on average, 130 per cent of the foundation budget. The comparison districts spent between 151 to 171 per cent of the foundation budget, while the State average was between 115 to 117 per cent of the foundation budget. These figures alone suggest that there are *structural*

[2]The evidence presented at trial concerned only four of the districts in which the plaintiffs reside, and the parties have not agreed to any finding of typicality. The judge concluded, however, that "the problems and challenges existing in the four focus districts repeat themselves in all or most of the school districts where the plaintiffs reside."

[3]Nothing short of dramatic progress will be needed if schools in the focus districts are to meet performance goals (measured by the percentage of students achieving scores of proficiency or above on MCAS tests) required to become eligible for Federal aid under the No Child Left Behind Act of 2001, 20 U.S.C. §§ 6301 et seq. (2002).

deficiencies in the formula for the foundation budget that must be addressed. I am cognizant that money alone will not solve all of the issues that are confronted daily by educators in our poorer urban districts, as are three of the four focus districts. On the other hand, a realistic assessment of the costs of effectively implementing an educational plan in such districts reasonably could, and should, contemplate other factors that affect student performance such as poverty, teenage pregnancy, nutrition, family issues, drugs, violence, language deficiencies and the need for remedial teaching and tutoring. It also should include a cost assessment of measures necessary to improve the administrative ability of the districts successfully to implement the educational plan.

Once this study is accomplished, we (meant collectively to include all three branches of government) shall be in a position to understand where assistance, administrative, financial and otherwise, can be targeted in the focus districts (and, eventually in other districts similarly situated) to bring them into reasonable balance with the rest of the State. Additionally, consideration must be given to increasing the personnel and resources of the department, which (as the judge found and Justice Ireland reiterates, *post* at 489 & n.6) are obviously inadequate to apply practical measures to resolve the needs of the focus districts. I would remand this case to the county court so that the single justice can monitor the remedial process and continue to use the judge (who has acquired special expertise on the state of education — or lack of it — in the four focus districts) to provide direction.

In this way, the court will play a vital role in ensuring that the Commonwealth's public schools are adequately financed that would not intrude on the other two branches. The problem is of such magnitude that the collective involvement of all three branches of government is needed. I advocate no role on the part of the court in the department's decisions as how best to bolster achievement of our public school students or how to allocate its resources between districts. In view of the enormity of the task, to remove the court from the process entirely is a great misfortune and mistake.

d. The *McDuffy* court held unequivocally that the Com-

monwealth has an obligation, enforceable by the court, to provide a public education of quality sufficient to provide its students to take their place as knowledgeable and productive citizens. *McDuffy*, *supra* at 564, 619-620. *McDuffy* made clear that the constitutional duty to "cherish" public schools must be understood as a "duty to ensure that the public schools achieve their object and educate the people." *Id.* at 564. The *McDuffy* court emphasized what the framers themselves well understood — that a free public education is a foundation of democracy. We stated:

> "The framers' decision to dedicate an entire chapter — one of six — to the topic of education signals that it was to them a central concern. Their decision to treat education differently from other objects of government by devoting a separate chapter to education rather than listing it as a matter within the powers of the legislative or executive branches indicates structurally what is said explicitly by words: that education is a 'duty' of government, and not merely an object within the power of government. Lastly, the framers' decision to place the provisions concerning education in 'The Frame of Government' — rather than in the 'Declaration of Rights' — demonstrates that the framers conceived of education as fundamentally related to the very existence of government."

*Id.* at 565.

The Chief Justice endorses in eloquent language the "constitutional imperative" announced in *McDuffy* and accepts the judge's factual findings as a "compelling, instructive account of the current state of public education." *Ante* at 431, 445. She believes, nonetheless, that the Commonwealth currently is meeting its duty to educate the plaintiff students in the focus districts, because the fulfilment of its duty to educate depends on effort and not on results. This proposition is way off the mark. The Chief Justice, in effect, would overrule *McDuffy*. The plurality result reached today both undermines protections guaranteed to the students in the focus districts (and in other districts where the obligations of the education clause are not being fulfilled) and ignores principles of stare decisis.

The *McDuffy* court unanimously held that children in the Commonwealth are constitutionally entitled to an education that is reasonably calculated to provide them with the seven capabilities set forth in the Supreme Court of Kentucky's guidelines in *Rose* v. *Council for Better Educ., Inc.*, 790 S.W.2d 186, 212 (Ky. 1989).[4] That pronouncement was reached after intensive and scholarly examination of the meaning and provenance of the education clause and consideration of the principles involved. All of the arguments now advanced by the parties were contemplated, and decided, in *McDuffy*, and there was then no misconception of the points involved. That court was acutely aware (as am I) of the lack of consensus among experts as to what constitutes an adequate education and what the costs of such an education might be. The *McDuffy* court, nevertheless, allowed the single justice to retain jurisdiction to ensure that the Commonwealth devised a plan and sources of funds sufficient "to provide education in the public schools for the children there enrolled, whether they be rich or poor and without regard to the fiscal capacity of the community or district in which such children live." Stare decisis is not a rigid requirement, but abandonment of precedent (especially when constitutional doctrine is involved) demands special justification. See *Arizona* v. *Rumsey*, 467 U.S. 203, 212 (1984). As recently articulated by a Justice of this court, "in order to overrule a prior case, it is not enough that some or all of the Justices of this court have some intellectual or academic disagreement with the earlier analysis of the issue. There must be something more, above and beyond such a disagreement, that would justify some exception to the doctrine of stare decisis." *Stonehill College* v. *Massachusetts Comm'n Against Discrimination*, 441 Mass. 549, 588 (2004) (Sosman, J., concurring). No exception to the doctrine is present in this case.

Justice Cowin, writing separately, boldly proclaims that *McDuffy* was "a display of stunning judicial imagination" that now should be overruled. *Ante* at 465. This is a surprising posi-

---

[4]Justice O'Connor dissented to express his view that the record failed to establish that the Commonwealth was not providing a public education in keeping with those guidelines. See *McDuffy* v. *Secretary of the Executive Office of Educ.*, 415 Mass. 545, 621 (1993) (O'Connnor, J., concurring in part and dissenting in part).

tion and one not advanced by the defendants. I strongly take is-
sue with Justice Cowin's assertion that twelve years of retained
jurisdiction, several months of trial, and over 300 pages of
meticulously prepared findings should now be "for naught,"
because, in her words, the court has no role to play (and never
had a role) in ensuring the Commonwealth's compliance with
the mandate embodied in the education clause. *Ante* at 468 n.2.
Interpretation of our Constitution is this court's most solemn
function. It would be intolerable indeed if our decisions constru-
ing constitutional provisions, such as *McDuffy* and others, were
no more constant than the changing membership of our court.
See *Mabardy* v. *McHugh*, 202 Mass. 148, 152 (1909) ("it is
. . . vital that there be stability in the courts in adhering to
decisions deliberately made after ample consideration. Parties
should not be encouraged to seek re-examination of determined
principles and speculate on a fluctuation of the law with every
change in the expounders of it").

Justice Cowin asserts that "where the Constitution com-
mands it, stare decisis must yield." *Ante* at 472. In support of
this pronouncement, she cites "many landmark [United States]
Supreme Court decisions that vindicated cherished rights after
centuries of neglect and corrected misguided judicial decisions
to conform to the dictates of the Constitution." *Ante* at 471. The
decisions she cites, however, represent reevaluations of
constitutional provisions in light of changing social circum-
stances and current perspectives on the nature of individual
rights — that were endorsed unanimously or by the majority of
an entire court — and not the separately expressed opinion of
one lone Justice (joined by another) that a unanimous decision
of the court, released only twelve years before, was "overreach-
ing," "unsupportable," or otherwise not in accordance with the
law. They, thus, are irrelevant.

There are other reasons for not abandoning the plaintiffs and
the full force of the *McDuffy* doctrine. A brief in support of the
plaintiff has been filed by many State legislators, arguing (what
we all know to be true) that the Commonwealth is not provid-
ing any sort of an adequate education to the majority of students

who attend public schools in low income districts and urging the court to adopt the judge's recommendations in full. The Governor has, correctly, identified the education crisis facing our schools as the civil rights issue of our generation.[5] Public support is already behind this task.

Practically everyone involved in this case assumed that the court was going to use this litigation to order the Legislature to appropriate money to remedy the severe problems identified. This assumption is incorrect. I am well aware of the limitations that apply to unelected members of a court ordering an elected Legislature and executive to appropriate money and, frankly, the difficulties that might be encountered if it became necessary to enforce any orders against recalcitrant elected officials. The problem, of course, is magnified considerably when dealing with expenditures needed to fund public education; the need to allocate resources equitably between various school districts achieving at different levels; the complexity of education policy in general; and the disagreement between competent experts on how best to remediate a nonperforming or poorly performing school district. But the remedy I propose has nothing to do with orders for the appropriation of money. The remedy takes full advantage of the exhaustive and excellent work of the Superior Court judge and brings to bear on the problem the voice and aid of the court as an integral part of the joint enterprise I have described. If money is needed, and is not forthcoming, there will be ample time to discuss the matter of appropriations later in a cooperative and nonadversarial way.

---

[5]Massachusetts is not alone in facing this issue. According to a recent article published in a national education publication, a swell of lawsuits have forced State legislatures and courts across the country to address the question of what constitutes an "adequate" education and have sought to identify the level of spending required by various provisions in their State Constitutions. See Olson, Financial Evolution, 24 Educ. Wk. 8, 10-11 (No. 17, Jan. 6, 2005). In the most famous of these, *Abbott* v. *Burke*, 153 N.J. 480, 525-528 (1998), the Supreme Court of New Jersey ordered the State to ensure that public schools in the poorest urban districts could spend at the same level as those in the wealthiest suburbs. In another, the Court of Appeals of New York upheld an order directing the State to conduct a cost study and to report back to the court. See *Campaign for Fiscal Equity, Inc.* v. *State*, 100 N.Y.2d 893, 925 (2003). Practically every other State that has recently faced the problem (and there are thirty-one of them), has dealt with it on constitutional terms. Olson, Financial Evolution, *supra* at 10.

Surely, our education clause means what *McDuffy* says it means. Were it otherwise, the clause becomes an empty promise. If the same kind of thinking that naysayers now espouse occurred in *Brown* v. *Board of Educ. of Topeka*, 347 U.S. 483 (1954) (*Brown I*), and in *Brown* v. *Board of Educ. of Topeka*, 349 U.S. 294 (1955) (*Brown II*), then those decisions would have gone the other way, with the United States Supreme Court refraining from becoming involved in serious matters of educational policy in the States, notwithstanding the compelling nature of the facts and the existence of unambiguous constitutional language (as is the situation here).

Rather than doing that, however, the United States Supreme Court took profound and decisive action and affirmed the status of educational opportunity in words that articulate the dictates of *McDuffy*:

> "Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him [or her] for later professional training, and in helping him [or her] to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he [or she] is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms."

*Brown I, supra* at 493.

Because our highly respected court has chosen to turn back from *McDuffy*, at a time when the focus districts most need our help, I respectfully dissent.

IRELAND, J. (dissenting, with whom Greaney, J., joins). Education is one key to success in life. "[I]t is doubtful that any child may reasonably be expected to succeed in life if he is denied

the opportunity of an education." *Brown* v. *Board of Educ. of Topeka*, 347 U.S. 483, 493 (1954). Today, a plurality of the court has left the children of the Commonwealth, who have been waiting now for over twelve years for the promises of a constitutionally required education this court declared in *McDuffy* v. *Secretary of the Executive Office of Educ.*, 415 Mass. 545, 621 (1993) (*McDuffy*), without recourse.

In my view, *McDuffy* contains clear, unequivocal language concerning the Commonwealth's duty to educate its children. The *McDuffy* court held that "the Massachusetts Constitution impose[s] an *enforceable duty* on the magistrates and Legislatures of this Commonwealth to provide education in the public schools for the children . . . whether they be rich or poor and without regard to the fiscal capacity of the community or district in which such children live" (emphasis added). *Id.* at 621. The court extensively analyzed whether the duty to provide education was aspirational, and concluded it was not. *Id.* at 606. The citizens "of the Commonwealth have a correlative right to be educated." *Id.* at 566 n.23.[1] The *McDuffy* court also concluded that "[a]n educated child *must* possess 'at least . . . seven . . . capabilities' " (emphasis added).[2] *Id.* at 618, quoting *Rose* v. *Council for Better Educ., Inc.*, 790 S.W.2d 186, 212 (Ky. 1989).

The *McDuffy* court also held that the duty was not being met and that simply offering to aid education was insufficient. *McDuffy, supra* at 606, 611, 614, 621. The Legislature also is not permitted to shift its duty to local governments. *Id.* at 606. Moreover, particularly as none of its conclusions is equivocal, I conclude that *McDuffy* did not envision that this constitutional

[1]In *Doe* v. *Superintendent of Schs. of Worcester*, 421 Mass. 117, 129 (1995), the court held that the *McDuffy* decision did not create a fundamental right to education that would trigger strict scrutiny of decisions by school officials. Chief Justice Liacos, the author of the *McDuffy* opinion, dissented, arguing that a child had a fundamental right to an education, according to *McDuffy*. *Doe* v. *Superintendent of Schs. of Worcester, supra* at 135 (Liacos, C.J., dissenting).

[2]Because of this language, I disagree with both Chief Justice Marshall's and Justice Cowin's assessments that, because the education clause is not specific, implementing the seven capabilities is not mandated. *Ante* at 454-455 (Marshall, C.J., concurring). *Ante* at 465 (Cowin, J., concurring). The specifics may not be mandated, but the capabilities are mandated by *McDuffy*.

duty would be subject to the vagaries of budget issues.[3] See also *id.* at 570-577 (discussing historic statutes calling for fines where communities failed to provide for education).

I write separately because I disagree with both concurring opinions. Because I agree completely with the reasons stated by Justice Greaney in his dissent, it is not necessary for me to address Justice Cowin's concurrence. Therefore, this dissent addresses the concurrence of the Chief Justice. I disagree with the Chief Justice's assessment that the enactment of the Education Reform Act and the existence of what she calls "painfully slow" progress fulfils the Commonwealth's enforceable constitutional duty to provide education to public school students.[4] *Ante* at 457. Although admittedly an imperfect analogy, the Chief Justice's endorsement of "painfully slow progress" reminds me of the "with all deliberate speed" standard the United States Supreme Court endorsed concerning school desegregation. *Brown* v. *Board of Educ. of Topeka*, 349 U.S. 294, 301 (1955). That Court expressed its frustration with the pace of desegregation eight years later. See, e.g., *Watson* v. *Memphis*, 373 U.S. 526, 531 (1963). I believe that the Chief Justice's assessment that this painfully slow progress does not violate the education clause implicitly overrules the holding of *McDuffy*.[5] I see no reason to do so. Rather, I agree with the analysis and conclusions of this court in *McDuffy* and of the Superior Court judge who was specially assigned to hear this case and report to the single justice, in particular her conclusion that the children of the Commonwealth are not receiving their constitutionally required education. Indeed, the Chief Justice herself states that the "goals of education reform adopted since *McDuffy* [clearly have not] been fully achieved." *Ante* at 435.

---

[3]The Chief Justice refers to a fiscal crisis in the State. *Ante* at 458. I note that there is no indication of the specific cause of this fiscal crisis, and that some of the decrease in funds has come from income tax reductions implemented since 2000. See, e.g., Higher Revenue Boosts Call for Tax Cut, Boston Globe, Feb. 2, 2005, at B2, noting the political debate over whether more income tax cuts should be implemented.

[4]In fact, as discussed *infra*, the Superior Court judge found that, essentially, the four focus districts have "not improved at all."

[5]In her concurrence, Justice Cowin advocates explicitly overruling *McDuffy*.

Although the judge found that the Education Reform Act of 1993, St. 1993, c. 71, "changed dramatically the manner in which public school . . . education is funded . . . and changed, almost as dramatically the role that the Commonwealth plays in pubic school education," the judge also concluded that *McDuffy* compels the court to analyze whether, through this legislation, the Commonwealth is providing students with the capabilities it outlined.

As the Chief Justice states, the judge's findings are a "model of precision, comprehensiveness, and meticulous attention to detail." *Ante* at 445. She evaluated the four districts using two indicators. The first was the curriculum frameworks the defendants have developed to fulfil the seven capabilities identified in *McDuffy*. The judge found that these frameworks, on paper are "of excellent quality, focusing on knowledge and skills that students need to acquire." Although she highlighted some positives in the four districts, when she evaluated each district's capacity to implement the frameworks, as detailed by Justice Greaney, *ante* at 474-478, the judge concluded that the four districts did not meet the constitutionally required minimum level of education.

The judge also compared the four districts to "comparison" districts of Brookline, Concord-Carlisle, and Wellesley (the districts that were comparison districts in *McDuffy*). As criteria for the comparison the judge used objective criteria that the Department of Education (department) and the office of educational quality and accountability use as a way to evaluate the school districts, including Massachusetts Comprehensive Assessment System (MCAS) scores, retention rates, on-time graduation rates, SAT scores, and postgraduation plans of high school seniors. She made extensive findings, detailed by Justice Greaney's dissent, and concluded:

> "While it is certainly true that MCAS scores in the [four] focus districts have improved, [their] scores are still much lower than the State average, not to speak of the comparison districts. As for the other criteria . . . dropout data, retention rates, graduation rates, SAT scores, post-secondary school plans — with few exceptions, *the four focus districts*

*have not improved at all,* and if one concentrates particularly on the *last five years,* when one would expect at least to begin seeing the impact of [Education Reform Act] investments, *there are almost no exceptions.*" (Emphasis added.)

After concluding that the students of the Commonwealth were not receiving their constitutionally mandated education, the judge identified areas of critical concern in the four districts: funding, special education, attracting qualified teachers, and facilities. The judge's findings concerning these areas are detailed by Justice Greaney, therefore I emphasize only some of the judge's findings concerning funding. The judge considered evidence concerning the foundation budget formula and found that even the defendants' own witnesses were not able to say that the foundation budget is adequate to provide the education called for by *McDuffy,* in terms of the curriculum frameworks.[6] For example, in 2001, a review commission created by the Legislature in the Education Reform Act reviewed the formula and concluded that it was inadequate in certain respects, including special education, class-size assumption for elementary grades, low-income factors, and full-day kindergarten. In addition, the commission called for a technology factor to be added to the budget.[7] The judge also noted that State funding has been

[6]The judge also found that comparison districts spent 130 per cent of the foundation budget on their schools, that the State average is approximately 115 per cent of the foundation budget, and that the four districts spent from between one hundred per cent and 110 per cent. She relied on these facts, in part, to conclude that the foundation budget formula is inadequate. The defendants argue that the reason comparison districts spend more than that called for in the foundation budget formula is because they begin with smaller budgets. I do not agree. The defendants define the foundation budget as "the [S]tate's estimate of the minimum amount needed in each district to provide an adequate educational program." The foundation budget formula is based on eighteen or nineteen separate categories of school expenditures with allowances for, inter alia, the costs of low-income students, and special education students in the regular day and out-of-district programs. Thus each district is given an amount of money deemed to be sufficient. Whatever else spending above this limit in the comparison districts means, it does not mean that the money they receive is impliedly less adequate than the amount received by the focus districts. See *ante* at 437 n.8, for a list of what the foundation budget includes.

[7]The reason for the inadequacy of the foundation budget is that the formula was created in 1993, before any of the curriculum frameworks were developed, and the formula not only has not been reviewed since the frameworks were developed but the department has no intention of doing so.

cut since fiscal year 2002. These cuts include a reduction of between .1 and 8.8 per cent in G. L. c. 70 aid and cuts in grants for class size reduction, MCAS remediation, preschool and early childhood education, and early reading programs.

In addition to this bleak picture of the four focus districts, I note that nearly one-third of eighth graders across the State failed to pass the MCAS science examination, tentatively scheduled to become a graduation requirement with the class of 2009. Although this alone is cause for concern, Springfield, Brockton, and Lowell had even higher student failure rates of seventy per cent, fifty-six per cent, and fifty-three per cent, respectively. Amid Science Push, Many Students Lag, Boston Globe, Jan. 20, 2005, at A1 and B5. Moreover, in the Commonwealth's report to the Federal government pursuant to the No Child Left Behind Act of 2001, 20 U.S.C. §§ 6301 et seq. (2002), it was reported that forty-nine per cent of the Commonwealth's schools have not improved test scores of black students and forty-six per cent of schools did not make gains in the scores of their low-income students. Schools Hit on Minority Progress, Boston Globe, Oct. 15, 2004, at B1 and B8. Given this information, coupled with the judge's findings and conclusions, I could not disagree more with the Chief Justice's assessment that the Commonwealth is meeting its constitutional duty.

Concerning the remedies ordered by the judge, the defendants rely on a separation of powers argument to state that the court cannot order remedies. However, their argument is undermined by the judge's conclusion:

> "[T]he difficulty with the defendants' solution is that the system they depend on to improve the capacities of schools and districts is not currently adequate to do the job. Since approximately 1980, the department's staff has been reduced by more than half — from over 1,000 employees to a number less than 400. At the same time, under the [Education Reform Act], the department's responsibilities have multiplied and intensified in critical ways. In terms of reviewing school district performance, in the three years since the department developed the school accountability system, it has been able to conduct school panel reviews in only twelve to fourteen schools

each year, although the annual pool of schools demonstrating 'low' or 'critically low' performance is in the hundreds."

I would impose only the remedies ordered by the judge that require the defendants, within six months, to determine the actual costs associated with (1) implementing all seven of the curriculum frameworks that the Commonwealth chose as a way to implement the *McDuffy* capabilities, and (2) measures that would provide assistance to districts effectively to implement the Commonwealth's educational program. I have faith that the Legislature and the executive, having had pointed out to them the deficiencies of their good faith attempt to provide the children of the Commonwealth with their constitutionally required education, will act to remedy the situation. *McDuffy*, *supra* at 619 n.92 ("We shall presume at this time that the Commonwealth will fulfil its responsibility with respect to defining the specifics and the appropriate means to provide the constitutionally-required education"). My faith is based on events that have occurred since the judge heard evidence in this case, indicating that the Legislature is very concerned with the state of education in the Commonwealth. For example, in July, 2004, the Legislature established a Department of Early Education and Care. St. 2004, c. 205. In December, 2004, more than one hundred legislators signed on to a bill that calls for the creation of a commission to examine education financing. See What Cost Education? Area Lawmakers Want to Create a Commission to Answer the Question, MetroWest Daily News, Dec. 15, 2004.[8] Moreover, in this case, the court received an amicus brief from forty-seven legislators urging us to endorse the judge's findings and conclusions.

In *Student No. 9* v. *Board of Educ.*, 440 Mass. 752, 768 (2004)[9]

---

[8]In addition, a coalition of business and school leaders intend to lobby the Legislature to turn around one hundred of the State's worst schools in three years. Group Seeks to Lift Worst State Schools, Boston Globe, Feb. 2, 2005, at A1 and B6.

[9]Chief Justice Marshall cites to *Student No. 9* v. *Board of Educ.*, 440 Mass. 752 (2004), many times to support her opinion. It is important to note that the case did not involve a constitutional issue, and therefore, it is of limited utility to the analysis in this case.

(Ireland, J., concurring), quoting *Brum* v. *Dartmouth*, 428 Mass. 684, 709 (1999) (Ireland, J., concurring), I repeated:

> "The education of our children is no less a compelling issue than their physical safety. 'Local schools lie at the heart of our communities. Each morning, parents across the Commonwealth send their children off to school. They entrust the schools with nothing less than the safety and well-being of those most dear to them — their own children. No arm of government touches more closely the core of our families and our children than our schools.' "[10]

I expressed my concern that in the years that passed since *McDuffy* was decided "progress toward providing education in all core subjects to all the Commonwealth's students educated with public funds, disabled and nondisabled, rich and poor, and of every race and ethnicity, has not advanced more." *Student No. 9* v. *Board of Educ.*, *supra* at 771 (Ireland, J., concurring). I feel the same today. As I have stated *supra*, that education is the key to success in life has been long recognized by courts. *Brown* v. *Board of Educ. of Topeka*, 347 U.S. 483, 493 (1954) (public education "is a principal instrument in . . . preparing [a child] for later professional training").

In *DeShaney* v. *Winnebago County Dep't of Social Servs.*, 489 U.S. 189 (1989), the State of Wisconsin, although documenting the abuse Joshua DeShaney received at the hands of his father, which abuse left him mentally impaired, did not act to protect him. Joshua sued the Department of Social Services claiming the department's failure to act deprived him of his liberty under the due process clause of the Fourteenth Amendment to the United States Constitution. *Id.* at 191. The Court expressed its "natural sympathy" for Joshua, but declined to hold that the due process clause offered him any relief. *Id.* at 202. In his dissent, Justice Blackmun lamented "Poor Joshua!,"

---

[10]In other contexts, I have expressed concern for the well-being of our children. See, e.g., *Barnett* v. *Lynn*, 433 Mass. 662, 667-668 (2001) (Ireland, J., concurring) (city officials should be expected to take reasonable measures to protect children when they have advance notice of danger); *Brum* v. *Dartmouth*, 428 Mass. 684, 708-710 (1999) (Ireland, J., concurring, with whom Abrams and Marshall, JJ., joined) (school officials should take steps to protect children from harm where they have advance notice of danger).

and stated that given a choice, he would adopt a " 'sympathetic' reading [of the due process clause], one which comports with dictates of fundamental justice and recognizes that compassion need not be exiled from the province of judging." *Id.* at 213 (Blackmun, J., dissenting). Today the Chief Justice states that she has sympathy for the "sharp disparities in the educational opportunities, and the performance, of some" children of the Commonwealth and states that, for many students, it is too late. *Ante* at 433, 457. See generally *ante* at 472-473 (Cowin, J., concurring). I am disappointed and saddened that, instead of acting to assist our children, five Justices leave them without recourse like "Poor Joshua."[11] Our children deserve better.

Accordingly, I respectfully dissent.

---

[11]Moreover, the lack of educational opportunity in the public schools has a ripple effect, as demonstrated by the awarding of the John and Abigail Adams Scholarships to the top scorers on the MCAS examination in each school district. In order to be eligible, students must first achieve a minimum score and then be among the top twenty-five per cent of their district. In Springfield, only seven per cent of seniors qualified, and in Lowell, only thirteen per cent qualified. Minorities Lagging in Tuition Program, Boston Globe, Dec. 11, 2004, at A1 and A7.